## COMMONWEALTH *vs.* RONALD COLEMAN.

Barnstable. March 7, 1983. — July 13, 1983.

Present: HENNESSEY, C.J., WILKINS, LIACOS, NOLAN, & O'CONNOR, JJ.

*Homicide. Practice, Criminal,* Instructions to jury, Objection, Retro-
activity of judicial holding, Capital case. *Jury and Jurors.*

At a murder trial held after this court's decision in *Commonwealth* v.
*Gould,* 380 Mass. 672 (1980), in which the defendant would, on time-
ly request, have been entitled to instructions permitting the jury to
consider evidence of his intoxication in determining whether the
murder was committed with extreme atrocity or cruelty, the defend-
ant did not preserve for appellate review the question of the judge's
failure to give such instructions, where he neither requested them nor
objected to their absence from the charge, nor objected to the judge's
answer to a question on this issue from the jury. [670-671]
In the circumstances of a murder trial, where there was evidence of a
brutal attack on the victim, no substantial risk of a miscarriage of
justice appeared from the judge's failure to instruct the jury that they
might consider evidence of the defendant's intoxication in determining
whether the murder was committed with extreme atrocity or cruelty.
[671-674]
At a criminal trial, during which a juror was excused at the request of the
defendant, there was no error in the judge's declining to hold a voir
dire examination of the remaining jurors to determine whether that
juror had improperly influenced them, in view of the fact that the
judge had questioned the juror before he was excused, and had found,
with sufficient support in the record, that the juror remained impar-
tial. [674-676]

INDICTMENTS found and returned in the Superior Court
Department on April 29, 1981.

The cases were tried before *Mone,* J.

*Evan T. Lawson* (*Paul M. Osborne* with him) for the
defendant.

*Gary A. Nickerson,* Assistant District Attorney, for the
Commonwealth.

Commonwealth *v.* Coleman.

LIACOS, J.  The defendant was convicted by a jury on December 10, 1981, of murder in the first degree for the fatal stabbing of Janice M. Leary.[1]  The defendant allegedly stabbed the victim twenty-six times on April 22, 1981, at the Sand Castle condominium in Provincetown.  He was sentenced to a term of life imprisonment, and now appeals his conviction.  G. L. c. 278, § 33E.

The defendant claims that the trial judge erred in failing (1) to instruct the jury that they were entitled to consider the defendant's intoxication in determining whether the murder was committed with extreme atrocity or cruelty and (2) to question the jury to determine whether any prejudice accrued to the defendant as a consequence of the empanelling of a juror who was excused during trial.  He also asks us to exercise our power, under G. L. c. 278, § 33E, to order a new trial or otherwise to mitigate punishment.  We affirm.

There was evidence of the following facts.  The defendant worked in a local establishment as a cook; Leary worked at the Sand Castle condominium and was involved in selling "time sharing" condominium units.  The defendant and Leary had lived together in Provincetown for various periods between 1979 and 1981.  During the period prior to April 22, 1981, their relationship had deteriorated.

On April 21, 1981, Leary had dinner with two coworkers, Barry D. Richardson and Robert F. Ditacchio. After dinner, they proceeded to the condominium unit occupied by Richardson at the Sand Castle.  Ditacchio shared a unit, located several doors away, with Kathleen Bailey, a coworker.  The defendant appeared at Richardson's door and demanded that Leary leave with him.  She refused, and he left.  The defendant testified that he had been armed with a knife that evening.

---

[1] The jury also found the defendant guilty of assault and battery by means of a dangerous weapon upon Barry D. Richardson, and the defendant received a concurrent sentence of from nine to ten years at the Massachusetts Correctional Institution at Walpole.  The jury found him not guilty of armed assault with intent to murder Richardson.

The next afternoon, April 22, 1981, the defendant removed his belongings from the apartment which he shared with Leary. A Provincetown police officer and Leary were present at 5 P.M. as the defendant was completing the task. Later, the defendant went to several bars and drank alcoholic beverages. He asked Francisco J. Montero, an acquaintance, if he could stay at Montero's cottage. Montero agreed. The defendant proceeded to the cottage, obtained a knife, and walked a short distance to Richardson's condominium unit.

Richardson and Leary were together inside; Ditacchio and Bailey were inside their condominium unit several doors away. Richardson testified that the defendant knocked on the door, and Leary allowed him to enter. The defendant placed his arm around her and told her, "Come on." She refused, saying, "No, it's all over." The defendant then said, "You are the first one that's ever done this to me," and stabbed her. The defendant and Richardson began to struggle. Leary managed to escape, and she ran toward the unit shared by Ditacchio and Bailey. Richardson retreated to an adjoining room and closed the door. The defendant banged on the door and then went after the victim.

Bailey and Ditacchio testified that they heard Leary knocking on their door, calling for help. Ditacchio opened the door and saw the defendant and Leary on the ground outside. The defendant was stabbing Leary in the head repeatedly. Ditacchio helped the screaming victim to her feet and attempted to pull her into the condominium unit. The defendant pursued and repeatedly stabbed the victim in the chest. She died there on the floor. The defendant got up from the floor, tangled briefly with Bailey, and ran off.

The police found the defendant a short time later at Montero's cottage with blood stains on his clothing and alcohol on his breath. Two police officers testified that he appeared to be sober.

The defendant testified in his own defense as follows. He testified that he had an intense relationship with Leary,

which had deteriorated in April, 1981. He believed that Richardson and the victim were having an affair. He spent the evening of April 22 drinking and went to the Sand Castle to speak with the victim about a postdated check she had given him. He took the knife for protection, as he felt threatened by Richardson. He testified that, while he was speaking with the victim, Richardson threw a glass at him. A struggle ensued, during which he stabbed Richardson and the victim. An interlude followed, and then he was attacked from behind by Ditacchio and Bailey. A second struggle ensued, with the victim being stabbed a second time.

Two psychiatrists testified at trial. Dr. William James, the medical director at Bridgewater State Hospital, testified that, under the standards set out in *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-548, 555 (1967), the defendant was criminally responsible for his acts on April 22, 1981. He testified that the defendant was not mentally ill, that his use of alcohol was not a sign of mental illness, and that a single incident of violent behavior did not demonstrate that the defendant was mentally ill. Dr. John MacIver, who had been appointed by the court to conduct a pretrial competency examination, testified for the defense. He testified that the defendant's ability to control his behavior had been substantially impaired on April 22, 1981, by personality traits, his use of alcohol, and the stress of his domestic situation.

1. The defendant argues that our decision in *Commonwealth* v. *Perry*, 385 Mass. 639, 649 (1982), which permits the jury to consider evidence of intoxication in determining whether the murder was committed with extreme atrocity or cruelty, should be applied retroactively to his case. In *Commonwealth* v. *Breese, ante* 540, 541 (1983), we held that the rule of *Perry* is the law applicable to cases tried after our decision in *Commonwealth* v. *Gould*, 380 Mass. 672 (1980) (jury entitled to consider evidence of mental impairment in determining whether murder was committed with extreme atrocity or cruelty). Since the defendant

was tried after *Gould, Perry* was the law at the time of this trial.

We turn to consider whether the failure to deliver an intoxication instruction on extreme atrocity or cruelty was properly raised at trial. "It is a fundamental rule of practice that where a party alleges error in a charge he must bring the alleged error to the attention of the judge in specific terms in order to give the judge an opportunity to rectify the error, if any." *Commonwealth* v. *McDuffee,* 379 Mass. 353, 357 (1979). Mass.R.Crim.P. 24(b), 378 Mass. 895 (1979). Fed.R.Crim.P. 30 (1982). Further, the objection must be made "before the jury retires to consider its verdict." Mass.R.Crim.P. 24(b).

Measured by these standards, the defendant failed to save his rights below. The judge instructed the jury that they could return a verdict of murder in the first degree if they found that it was committed with deliberately premeditated malice aforethought, or committed with extreme atrocity or cruelty. He instructed the jury that they could consider the evidence of voluntary intoxication and mental impairment in determining whether the defendant acted with deliberate premeditation. The judge further instructed the jury that evidence of mental impairment was relevant to the question whether the murder was committed with either deliberate premeditation or extreme atrocity or cruelty. There was no reference in the jury instructions as to whether the evidence of voluntary intoxication was relevant to the issue of murder in the first degree committed with extreme atrocity or cruelty. The defendant neither submitted a request that a *Perry* instruction be given nor objected to the absence of such instruction before the jury had retired.

On the second day of their deliberations, the jury submitted several questions to the judge. One question asked was: "Does the influence of voluntary intoxication as applied to this question [extreme atrocity] also justify reduction to second-degree murder as it does when applied to the question of premeditation." In response, the judge repeated the

essence of his prior charge concerning extreme atrocity or cruelty and instructed them that "voluntary intoxication is not a mitigating factor in the case of murder with extreme atrocity or cruelty." Defense counsel then made a "general objection" to the charge on extreme atrocity or cruelty, stating that, "as charged, the state of the law is so vague as to render that portion of the crime unconstitutionally vague." Defense counsel further objected that the charge did not define criminal intent as an element of the crime.[2]

Defense counsel's objection failed adequately to preserve the issue he now seeks to raise. First, there was never a timely objection to the instructions. An objection to supplementary instructions which merely repeat the instructions which the judge delivered during his main charge is not timely. To the extent that the judge went beyond his prior instructions, defense counsel never specifically objected to the judge's answer to the jury's question. Cf. *United States* v. *Jackson*, 569 F.2d 1003, 1009 (7th Cir.), cert. denied, 437 U.S. 907 (1978). Where a jury question squarely presents an issue, it is incumbent upon defense counsel to make his objection known in specific terms. The defendant did not save his rights below.

We are not inclined to relieve the defendant of this failure. Our decision in *Perry* "was clearly foreshadowed" by *Gould*, and defense counsel need not have been clairvoyant to have anticipated it. See *Commonwealth* v. *Breese, supra* at 550. Had the full import of *Gould* been brought to the judge's attention, we cannot say that he would not have answered the jury's question differently. Contrast *Commonwealth* v. *McDuffee, supra* at 359. Further, since the rule of *Perry* is not constitutionally man-

---

[2] The defendant has not argued here whether the law or the charge was vague, and has therefore waived the point. We have rejected the proposition that "a defendant may be convicted of murder in the first degree based upon extreme atrocity or cruelty only if it is found that the defendant had a specific mental intent or knowledge of the character of his acts beyond the malice aforethought required for murder in the second degree." *Commonwealth* v. *Cunneen, ante* 216, 226 (1983).

dated, there is no substantial constitutional question. Our review, therefore, is limited to determining whether we should exercise our power under G. L. c. 278, § 33E. *Commonwealth* v. *Silva*, 388 Mass. 495, 505 (1983).

Under G. L. c. 278, § 33E, we are required to consider broadly the whole case on the law and the facts to determine whether there is a substantial risk of a miscarriage of justice. *Commonwealth* v. *Almon*, 387 Mass. 599, 604 (1982).[3] We have reviewed the whole case and conclude that there is no substantial risk of a miscarriage of justice. *Commonwealth* v. *Silva, supra* at 506.

The jury's verdict established that the defendant was guilty of murder. *Commonwealth* v. *Perry, supra* at 649. The jury therefore found that the defendant committed the crime and was responsible for the manner of the victim's death.[4] The only possible risk of a miscarriage of justice is that a *Perry* instruction might have caused them to conclude that the murder was not committed with extreme atrocity or cruelty.[5]

In *Commonwealth* v. *Cunneen, ante* 216 (1983), we delineated a number of factors which, along with mental impairment and intoxication, a jury may consider in deciding whether a murder was committed with extreme atrocity or cruelty. "These include indifference to or taking pleasure in the victim's suffering, consciousness and degree of suffering of the victim, extent of physical injuries, number of blows, manner and force with which delivered, instrument employed, and disproportion between the means needed to cause death and those employed." *Id.* at 227.

---

[3] Even in cases where we have exercised our power under § 33E to order a new trial or to reduce the verdict, we have recognized that it should be used with restraint. *Commonwealth* v. *Dalton*, 385 Mass. 190, 197 (1982). *Commonwealth* v. *Williams*, 364 Mass. 145, 151 (1973).

[4] We note that the thrust of the defendant's argument was not to dispute the homicide but to seek to persuade the jury to return a verdict of the lesser offense of voluntary manslaughter.

[5] There is no claim of error concerning the instructions on premeditation. There was sufficient evidence before the jury for them to have concluded that the defendant acted with premeditation.

The evidence showed that the victim suffered a brutal and painful death. Expert medical testimony indicated that the victim had been stabbed twenty-six times. There was severe damage to the victim's internal organs, skull, ribs, chest bone, and spine. The severity of the damage done to the victim's skeletal structure indicated that the blows were delivered with great force. The tip of the knife used by the defendant broke off and was found embedded in the victim's skull. The medical testimony also indicated that any one of five wounds was sufficient to cause death. Further, the victim might have been conscious of her suffering for as long as five minutes. The defendant's persistence in seeking to inflict additional wounds demonstrated an indifference to the victim's suffering. Taken together, this evidence would warrant a finding that the murder was committed with extreme atrocity or cruelty.

We do not believe that the evidence concerning the defendant's intoxication requires a different conclusion. See *Commonwealth* v. *Maldonado, ante* 626, 632-633 (1983). The degree of the defendant's intoxication was disputed. Two police officers testified that he appeared sober shortly after the murder. There was testimony from several witnesses that the defendant did not appear to be intoxicated prior to the murder. The defendant received the benefit of an instruction concerning mental impairment. Despite some evidence of mental impairment, the jury still found him guilty of murder in the first degree. Finally, intoxication is only a single factor. In the present case, it simply did not detract from the vicious manner in which the crime was carried out. We decline to exercise our power to order a new trial or to reduce the verdict.

2. During the empanelling of the jury, the prospective jurors, including Douglas B. Bohannon, were asked by the judge whether they, or a member of their immediate family, had been the victim of a violent crime or a complainant or a witness in a criminal case. Bohannon answered both questions in the negative and was seated as a juror.[6] During

---

[6] After a list of witnesses was read to the venire, Bohannon came forward and informed the judge that he knew one witness and the witness's daughter.

the trial, defense counsel brought to the judge's attention the fact that Bohannon had been a summer police officer for ten years in the town of Orleans, and that a complaint had issued against a person who allegedly threw an egg at Bohannon on Halloween night in 1973.

The judge then questioned Bohannon concerning his answers. This questioning revealed that Bohannon worked in a retail store at the time of the trial, that he had not applied for the complaint in the egg throwing incident, and had not testified at the trial on the complaint. Bohannon revealed that he had been either a witness or a complainant in several motor vehicle cases during his tenure as a police officer, and that his brother-in-law was a full-time police officer. Bohannon told the judge that he believed himself to be impartial, that he did not think motor vehicle traffic violations were criminal, nor did he consider his brother-in-law to be a member of his immediate family. Bohannon stated that one juror was aware of his position as a summer police officer.

The judge found that Bohannon had remained impartial and denied the defendant's motion for a mistrial. He excused Bohannon at the request of defense counsel. When the trial resumed, he informed the other jurors that one juror had been excused for personal reasons and inquired whether they had discussed the case among themselves. There was no response.

The defendant argues that the judge should have conducted a voir dire examination of the jury to determine whether Bohannon improperly had influenced the other jurors. We disagree. When a claim of potentially extraneous influence on a jury is brought to the attention of the judge after the jury have been selected, he should determine whether a serious question of possible prejudice has been raised. *Commonwealth* v. *Jackson,* 376 Mass. 790, 800 (1978). Even if we were to classify the conduct of a fellow juror as an extraneous influence, see *Commonwealth* v. *Fidler,* 377 Mass. 192 (1979), there was no serious question of possible prejudice. The judge questioned Bohannon

concerning his answers and concluded that Bohannon had remained impartial. His finding is supported by the record.[7] Bohannon's answers to the questions put to him during empanelment were reasonable. See *United States* v. *Robbins*, 500 F.2d 650, 652 (5th Cir. 1974); *Brown* v. *United States*, 356 F.2d 230, 232-233 (10th Cir. 1966). See also *United States* v. *Vargas*, 606 F.2d 341, 345 (1st Cir. 1979); *United States* v. *Mulligan*, 573 F.2d 775, 778 (2d Cir.), cert. denied, 439 U.S. 827 (1978). Once the judge found that Bohannon was impartial, there was no basis in the record for concluding that a serious question of possible prejudice existed. Cf. *Smith* v. *Phillips*, 455 U.S. 209, 215-218 (1982). *Commonwealth* v. *Dalton*, 385 Mass. 190, 195 (1982). The judge acted properly.

3. After review of the record pursuant to G. L. c. 278, § 33E, we find no basis on which to disturb the verdict of guilty of murder in the first degree.

*Judgments affirmed.*

---

[7] In determining whether a juror is biased, a judge may rely on the testimony of the juror. See *Smith* v. *Phillips*, 455 U.S. 209, 215-217 (1982); *Commonwealth* v. *Dalton*, 385 Mass. 190, 194-195 (1982); *United States* v. *Robbins*, 500 F.2d 650, 653 (5th Cir. 1974).