COMMONWEALTH *vs.* ADRIANO BARROS
(and five companion cases[1]).

Suffolk. December 2, 1996. - July 28, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Practice, Criminal,* Instructions to jury, Capital case, Argument by prosecutor. *Intoxication. Self-Defense. Homicide. Malice. Constitutional Law,* Self-incrimination, Search and seizure. *Identification. Search and Seizure,* Probable cause, Threshold police inquiry. *Probable Cause. Jury and Jurors. Joint Enterprise.*

At a murder trial, there was not sufficient evidence to warrant an instruction to the jury on the issue of self-defense, consequently this court declined to consider the completeness of the instruction on self-defense that the trial judge did give. [575]

Evidence at a murder trial did not warrant a finding that any claimed belief of the defendant that he was in imminent danger of being killed or seriously injured by the victim would have been objectively reasonable, where such a belief could not be deemed reasonable on the ground that, due to intoxication, he misapprehended the situation [575-576]; moreover, the evidence did not warrant a finding that the defendant availed himself of all proper means to avoid physical combat before resorting to the use of deadly force [576-577].

At a murder trial, the judge was not required to repeat his instruction on the relevance of intoxication in response to the jury's limited request for a further instruction regarding the elements of malice. [577]

No substantial likelihood of a miscarriage of justice arose at a murder trial where there was no error in the judge's omission of an instruction on the relevance of intoxication to whether the defendant acted with extreme atrocity or cruelty, where the instruction was not requested and no objection to its omission was made [577-579]; further, where the jury rejected the argument that the defendant's intoxication mitigated malice, there was no substantial likelihood that, had the jury been instructed on intoxication and extreme atrocity or cruelty, the jury would have found mitigation of that circumstance [579].

Evidence at the trial of a murder indictment supported the judge's determination that the Commonwealth had proved beyond a reasonable doubt that the defendant's statement to police following his arrest was voluntary and intelligent. [579]

Defendants' rights to a fair trial were not violated by a statement in the

[1]Two against Aristides Duarte, two against James Villaroel, and one against Adriano Barros.

prosecutor's closing argument to which the defendants objected and which the judge immediately instructed the jury to disregard. [580]

At a murder trial, the prosecutor's argument relative to whether the murder was committed with extreme atrocity or cruelty was relevant and did not constitute an improper appeal to the jury's sympathy [580-581]; however, the prosecutor's statement that the victim "had a right to live" was inappropriate and his kicking of objects in the courtroom, including the jury box, was an impermissible appeal to the jury's emotions: where the Commonwealth's evidence was strong and the judge properly instructed the jury not to consider arguments as evidence, the errors were unlikely to have affected the jury's verdicts [581-582].

Defendants' motions to suppress evidence including identifications of them on the ground that they had been arrested without probable cause were correctly denied, where, in the totality of the circumstances, police were warranted in stopping the defendants on the basis of a radio transmission describing them and their location and had acted reasonably in transporting them one and one-half blocks to the scene where a murder had occurred minutes before, whereupon the defendants were identified and arrested. [584-585]

At a murder trial, the judge properly permitted the jury to take notes during the judge's instructions, and the jury were otherwise properly instructed in accordance with the law. [585-586]

INDICTMENTS found and returned in the Superior Court Department on April 30, 1992.

Pretrial motions to suppress evidence were heard by *Robert A. Mulligan*, J., and the cases were tried before him.

*Lawrence P. Murray (Henry F. Owens, III*, with him) for Adriano Barros.

*Willie J. Davis* for Aristides Duarte.

*Murray A. Kohn* for James Villaroel.

*Mark D. Zanini*, Assistant District Attorney (*James J. Larkin*, Assistant District Attorney, with him) for the Commonwealth.

O'CONNOR, J. Adriano Barros, Aristides Duarte, James Villaroel and Lamar Johnson were tried together before a jury. The jury convicted them of murder in the first degree and assault and battery by means of a dangerous weapon. They have appealed. Johnson's appeal was severed from those of his codefendants. In the present appeals, the defendants Barros, Duarte, and Villaroel have raised many issues which we discuss below.[2] We affirm the convictions. We decline to exercise our

---

[2]It appears that the defendants have served their sentences for assault and battery by means of a dangerous weapon. It is unclear whether they are now

extraordinary power under G. L. c. 231, § 33E, to order a new trial or direct the entry of a verdict of a lesser degree of guilt.

We summarize the relevant background evidence as follows, reserving further discussion of evidence as it relates to specific issues. On the night of April 22, 1992, Charleston Sarjeant, with his wife and a friend, Eddy Toomer, entered the Tasty Chicken restaurant in the Dorchester section of Boston and ordered food. While Toomer, Sarjeant, Sarjeant's wife, and a customer named Terrance Hudson waited for their orders, a group of young men that included the defendants gathered on a traffic island in front of the restaurant. Without provocation, the defendant Villaroel threw a beer bottle against the front of the restaurant and shouted, "Let's shut this place down," or words to that effect, and moved toward the restaurant. The group, including the defendants Duarte and Barros, followed.

Villaroel, carrying a large portable radio, sometimes described as a "boom box," entered the restaurant ahead of the others and struck Sarjeant on the head with the radio, using enough force to draw blood. Within seconds, ten to twelve men encircled Sarjeant and began beating, punching, and kicking him. Villaroel pulled out a knife and began stabbing Sarjeant. During the repeated stabbing the other attackers continued to punch, kick, and stomp Sarjeant about his head and face until he eventually lost consciousness. Police and medical personnel arrived promptly but were unable to save Sarjeant's life.

An autopsy revealed seven or more areas of blunt trauma to the head and face, nine stab wounds to the neck, back and thighs, and one cutting wound. The medical examiner who conducted the autopsy concluded that Sarjeant had died as a result of multiple stab wounds with blunt head trauma.

At the trial, several witnesses identified Villaroel, Duarte, and Barros as having participated in the attack on Sarjeant.

We now address the numerous issues on appeal.

I. We begin with Villaroel's contention that "[t]his court should reverse [his] conviction because the trial court refused to instruct the jury, specifically, that it may consider evidence of intoxication in deciding whether [he] reasonably acted in self-defense because (1) there was evidence of his intoxication, (2)

---

challenging those convictions. We shall assume that all of the convictions are before us. In any event, no defendant suggests in his brief that, if we affirm his conviction of murder in the first degree, we nevertheless should reverse his conviction of assault and battery by means of a dangerous weapon.

in the past, he was beaten and robbed, stabbed three times, and shot once, and (3) he suspected that [the victim] was a former assailant reaching for a weapon." Villaroel testified that he had stabbed Sarjeant. He also testified, however, that, on the day of the murder, beginning shortly after he awoke and continuing through that day and evening, he consumed a large amount of beer and liquor, smoked marihuana, ingested cocaine and the prescription drug Percocet, and as a result was intoxicated at the time of the killing at the Tasty Chicken restaurant later that night. He testified that, his perceptions being distorted, he believed that Sarjeant had attacked and stabbed him several years previously and, thinking that Sarjeant was reaching for a weapon when he moved his hand to his side, Villaroel struck Sarjeant first with the "boom box" and then, after. Villaroel was knocked down and punched, he drew his knife and stabbed Sarjeant.

An instruction on self-defense is required in a homicide case if the evidence most favorable to the defendant warrants a conclusion that "the defendant: (1) had reasonable ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force, (2) had availed himself of all proper means to avoid physical combat before resorting to the use of deadly force, and (3) used no more force than was reasonably necessary in all the circumstances of the case. *Commonwealth* v. *Harris*, 376 Mass. 201, 208 (1978), and cases cited." *Commonwealth* v. *Harrington*, 379 Mass. 446, 450 (1980).

The judge instructed the jury on the law of self-defense, he said, "out of an abundance of caution." Villaroel argues that the judge erred in his instruction because he failed to inform the jury that they could consider Villaroel's intoxication in evaluating whether he reasonably believed that he was in imminent danger of serious bodily injury or death. There was no error. The evidence was insufficient to warrant an instruction on self-defense. Therefore, we do not reach the question whether the instruction that was given was complete.

Whether, due to his intoxication, Villaroel actually believed that he was in imminent danger of being killed or seriously injured by Sarjeant and responded by attacking Sarjeant, is of no consequence for two reasons, the first of which is that the evidence did not warrant a finding that such a belief would have

been objectively reasonable. The defendant's belief cannot be deemed reasonable on the ground that, due to intoxication, he misapprehended the situation. In *Commonwealth* v. *Albert*, 391 Mass. 853 (1984), the judge instructed the jury in relevant part: "If the assailant is threatening him [the defendant] or doing some act endangering his personal safety, and if he reasonably thought that his personal safety or life was in peril, he is to be judged by the situation in which he is placed. And if he acted as a person of *ordinary prudence* and *firmness of mind*, even though he may have misjudged the situation, and if he reasonably believed that his life or person was in danger, then the law says he may protect himself by adequate and appropriate means" (emphasis added). *Id.* at 861 n.3. This court, in *Albert*, noted that the defendant's "first criticism [was] that it was error for the judge to employ an 'objective' standard in his self-defense instructions with respect to the defendant's apprehension of danger and his reaction to the threat." *Id.* at 861. The court then responded, "The judge's charge was correct; its language closely tracked the self-defense standard we enunciated in *Commonwealth* v. *Harrington*, 379 Mass. 446, 450 (1980). As we noted in a related context regarding the distinction between murder and manslaughter, '[s]ince malice does not require any actual or subjective intent to kill or to inflict grievous bodily harm, there is no basis in our law for the defendant's suggestion that provocation should be viewed subjectively.' *Commonwealth* v. *Amaral*, 389 Mass. 184, 190 (1983). See *Commonwealth* v. *Starling*, 382 Mass. 423, 428 (1981). The same holds true for the self-defense test, which requires that the defendant 'had *reasonable* ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm' and that he 'used no more force than was *reasonably* necessary in all the circumstances of the case.' *Harrington*, *supra* at 450" (emphasis in original). (Footnote omitted.) *Id.* See also *Commonwealth* v. *Kendrick*, 351 Mass. 203, 211 (1966). A determination as to whether a defendant's belief concerning his exposure to danger was reasonable may not take into account his intoxication.

The second reason that it is of no consequence that Villaroel may have believed that he was in imminent danger of being killed or seriously injured by Sarjeant and responded by attacking Sarjeant is that the evidence did not warrant a finding that Villaroel availed himself of all proper means to avoid physical

combat before resorting to the use of deadly force. See *Commonwealth* v. *Naylor*, 407 Mass. 333, 334-335 (1990). *Commonwealth* v. *Harrington, supra* at 450. Here, there was no evidence that Villaroel could not have retreated on seeing Sarjeant make a move as if to reach for a weapon, as Villaroel testified he did.

II. Villaroel also argues that "[t]his court should reverse [his] conviction because intoxication was a central theory of [his] defense and the trial court refused to re-instruct the jury to consider the effect of [his] intoxication on whether the government proved malice even after re-instructing on malice, at the jury's request, after hours of deliberation, thereby confusing the jury and violating the defendant's common law and constitutional due process rights." After the jury had deliberated for several hours, they requested the judge to "[r]edefine malice aforethought." Villaroel asked the judge also to reinstruct the jury on the relevance of intoxication to malice. The jury did not request, and the judge did not give, such a reinstruction. It is true that evidence of intoxication may be considered in determining whether the Commonwealth has proved that the defendant acted with malice. *Commonwealth* v. *Delaney*, 418 Mass. 658, 665-666 (1994). The judge properly instructed the jury in that regard in his main instruction. Villaroel does not suggest otherwise. The judge was not required to repeat that instruction in response to the jury's request for a further instruction regarding the elements of malice. "The necessity, extent, and character of supplemental instructions in response to a jury request are matters within a trial judge's discretion." *Commonwealth* v. *O'Connor*, 407 Mass. 663, 667 (1990). The jury's question was a limited one and "the judge was not required to repeat the whole or any part of his original instructions to them." *Commonwealth* v. *King*, 366 Mass. 6, 11 (1974), cert. denied sub nom. *McAlister* v. *Massachusetts*, 419 U.S. 1115 (1975).

III. Villaroel seeks relief under G. L. c. 278, § 33E, on the ground that, because his "core theory of defense was distorted perception from intoxication and the trial court did not specifically instruct that intoxication is relevant to whether he acted with extreme atrocity or cruelty, the jury convicted on that theory alone." No such instruction was requested, and no objection to this aspect of the charge was made at the trial. Therefore, our review pursuant to G. L. c. 278, § 33E, is limited to whether

there has been a "substantial likelihood of a miscarriage of justice." *Commonwealth* v. *Hutchinson*, 395 Mass. 568, 578 (1985). *Commonwealth* v. *Palmariello*, 392 Mass. 126, 145 (1984).

The judge's instruction on intoxication was as follows:

> "Now, in this particular case you heard evidence about alcohol consumption and drug consumption. You, the jury, may consider credible evidence of the effects of a defendant's consumption of drugs and/or alcohol in deciding whether the Commonwealth has met its burden of proving a defendant's state of mind and intent beyond a reasonable doubt.

> "Whenever the Commonwealth must prove a defendant's intention to do something, an intention to deliberately premeditate, an intention to kill, cause grievous bodily harm, or to commit an act which in the circumstances known to him would create a plain and strong likelihood that death would follow the contemplated act, when the Commonwealth has to prove those things, or when the Commonwealth has to prove the defendant is aware that the battery that he's committing is a life endangering assault and battery, you consider all the circumstances which bear upon a person's intent, including any credible evidence of the effect on a defendant of his consumption of alcohol or drugs, or alcohol in combination with drugs."

In *Commonwealth* v. *Doucette*, 391 Mass. 443, 455 (1984), we stated that, "while intoxication is no excuse or mitigation of a crime committed, a defendant is entitled, upon request, to an instruction to the effect that if he were so far overcome by intoxicating substances as to be rendered incapable of deliberate premeditation or of committing murder with extreme atrocity or cruelty, the jury must return a verdict of murder in the second degree, if they are satisfied beyond a reasonable doubt that all other elements of the crime are present." We again hold that such instructions, "although required if requested, are not constitutionally based." *Id.* Because there was no request the judge did not err by not instructing the jury concerning the relevance of intoxication to extreme atrocity or cruelty. Furthermore, " '[i]t is a fundamental rule of practice that where a

party alleges error in a charge he must bring that alleged error to the attention of the judge in specific terms in order to give the judge an opportunity to rectify the error, if any.' *Commonwealth* v. *McDuffee*, 379 Mass. 353, 357 (1979). Mass. R. Crim. P. 24 (b), 378 Mass. 895 (1979)." *Commonwealth* v. *Coleman*, 389 Mass. 667, 671 (1983). That was not done in this case.

In light of the omission in the charge and our duty under G. L. c. 278, § 33E, we must consider whether the evidence of intoxication was so great that, taking into account the entire charge, a substantial likelihood of a miscarriage of justice exists. In reaching a verdict of murder, the jury had to conclude that each of the defendants acted with malice. Having in mind that the judge properly instructed the jury that intoxication may mitigate malice, it is apparent that the jury concluded beyond a reasonable doubt that, in this case, Villaroel was not intoxicated to a degree that was inconsistent with malice. Having rejected the proposition that Villaroel's intoxication mitigated malice, there is no substantial likelihood that, had the jury been instructed that intoxication is also relevant to whether Villaroel acted with extreme atrocity or cruelty, they would have found that he did not do so.

IV. Villaroel argues that "[t]his court should reverse [his] conviction because use of his involuntary statement to the police to impeach his trial testimony violated his Federal and State constitutional privilege against self-incrimination." Following his arrest, Villaroel gave a statement to the police which minimized his involvement in the attack. In that statement he admitted being present during the attack but claimed that someone else had stabbed Sarjeant. Significant portions of his trial testimony, particularly those that focused on self-defense, were inconsistent with the version of events he had earlier given to the police. He argues here that, because he was intoxicated at the time the statement was made and he was "frightened" and "tricked" by the police, his statement was involuntary, and thus it should not have been admitted. After conducting a voir dire, the judge determined that the Commonwealth had proved beyond a reasonable doubt that Villaroel's statement was the product of his free will, that is, was voluntary and intelligent. The evidence warranted that finding and Villaroel has failed to identify, and we have not found, anything in the record that requires us to reject the judge's determination.

V. We next consider the three defendants' arguments concerning the Commonwealth's summation to the jury. The defendants argue that they were prejudiced by the prosecutor's improper assertion of, and reliance on, facts for which there was no evidentiary support. They also argue that, in his summation, the prosecutor impermissibly appealed to the jury's sympathy both by his words and his conduct, and that, in addition, he unfairly attacked Villaroel's credibility.

Eddy Toomer was with Sarjeant when he was attacked. Toomer identified the defendants as participants when they were brought back to the crime scene. However, at the trial, he testified that he was unable to identify them. The prosecutor said in his closing argument, "You know from what he told you on the stand that he had been in custody on another matter. You can draw a reasonable conclusion why he didn't identify anybody in court." The defendant Barros objected. The defendants argue on appeal that the prosecutor's message to the jury was that they should conclude that Toomer's "inability" to identify the defendants at trial was simply a response to pressure applied to him while he was in custody. Although, contrary to the defendants' contention, there was evidence that Toomer was in custody, it is at least questionable whether the jury would have been warranted in inferring that, as a result of being in custody, Toomer was subjected to pressure not to identify the defendants in court. There was no direct testimony to that effect. In any event, the judge sustained Barros's objection to the prosecutor's jury argument and immediately instructed the jury to disregard the comment. The jury are presumed to follow such instructions. *Commonwealth* v. *Morgan*, 422 Mass. 373, 379-380 (1996). *Commonwealth* v. *Leno*, 374 Mass. 716, 719 (1978). The defendants' rights to a fair trial, therefore, were not violated by the prosecutor's argument implying that, if Toomer had not been intimidated while in custody, he would have identified the defendants at trial as having participated in the attack on Sarjeant.

In his summation, the prosecutor also said to the jury that Sarjeant was "every man" and "could have been anybody." The prosecutor asked the jury to "[i]magine what it's like going under that for two, three, five, ten minutes, being kicked, being kicked in the head, being kicked in the chest, being kicked in the arms, being kicked all over the place, being surrounded with no avenue of escape. . . . Jimmy Villaroel knew what it was

like. He tells you that he's been stabbed before, so he knows what it's like. They inflicted pain intentionally on this man in front of his wife. . . . Not only is it cruel and atrocious to him, the man that died, but it's cruel and atrocious to do this in a well lit area in front of your wife, as the blood ebbs out of you, and your wife is standing there, and you're crying for help." In determining whether the murder was committed with extreme atrocity or cruelty, the jury properly could have considered the defendants' awareness of, but indifference to, or pleasure in, the victim's suffering. See *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983). The prosecutor properly argued that Villaroel's knowledge of the pain associated with being stabbed supported the prosecutor's assertion that Villaroel had acted with extreme atrocity or cruelty by reason of his indifference to the victim's suffering. The evidence that Sarjeant was killed in the presence of his wife and friend was also relevant because, in considering whether a defendant has acted with extreme atrocity or cruelty, "the inquiry focuses both on the defendant's actions, in terms of the manner and means of inflicting death, and on the resulting effect on the victim." *Commonwealth* v. *Gould*, 380 Mass. 672, 684 (1980), quoting *Commonwealth* v. *Lacy*, 371 Mass. 363, 367 (1976). There was evidence that during the final moments of his life Sarjeant saw and heard his wife crying and screaming for help. The jury appropriately could consider the resulting effect on the victim of witnessing his wife's anguish as he died. In doing so, the jurors could rightly consider the likely emotional response that "every man" or "anybody" would have in response to being beaten and stabbed to death while his wife looked on.

During his summation, the prosecutor told the jury that Sarjeant had "a right to live, and these guys, these guys took it away from him." The defendants made timely objections. Also, during his summation, the prosecutor kicked a trash can and the jury box and the defendants promptly objected to that conduct. The "right to live" argument was inappropriate, see *Commonwealth* v. *Palmariello*, 392 Mass. 126, 135 (1984), as was the kicking of the trash can and the jury box. The latter conduct was not a helpful indicator of the effect on Sarjeant and can only be viewed as an impermissible effort to sway the jury by appealing to their emotions. See *Commonwealth* v. *Kozec*, 399 Mass. 514, 517 (1987). Because the defendants duly objected to the "right to live" argument and the aforementioned conduct,

we must consider the consequences of those prosecutorial errors. "[O]n the facts of given cases, close questions arise whether the prosecutor has gone over the line between fair and improper argument. In such cases, we must and do recognize that closing argument is identified as argument, the jury understands that, instructions from the judge inform the jury that closing argument is not evidence, and instructions may mitigate any prejudice in the final argument." *Id.* Here, the Commonwealth's case was strong. At the trial, numerous eyewitnesses identified the defendants as participants in the attack on Sarjeant and there was abundant evidence of extreme atrocity or cruelty. The judge properly instructed the jury not to consider closing arguments as evidence, and the prosecutor asked the jury to decide the case based on the evidence and not on sympathy. In these circumstances, we are satisfied that the errors made by the prosecutor in his summation, to which timely objection was made, are unlikely to have affected the jury's verdicts, and therefore are not reversible. Cf. *Commonwealth* v. *Loguidice*, 420 Mass. 453, 457 (1995); *Commonwealth* v. *Kozec*, *supra* at 518, 526.

We turn now to the final issue relative to the prosecutor's summation. The defendants argue that the prosecutor's comment in his summation that "[y]ou can believe a murderer if you like," was improper. At trial, the defendants did not object. We agree that the comment was improper in that it suggested to the jury that they should reason in a circular fashion, that is, to conclude from the evidence, including Villaroel's testimony, that he was a murderer, and then to disbelieve Villaroel's testimony because he was a murderer. No objection having been made, we "apply the standard of G. L. c. 278, § 33E (1990 ed.). We must decide whether there is a substantial likelihood that a miscarriage of justice has occurred." *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992). *Commonwealth* v. *Palmariello*, *supra* at 145. We conclude that there was no such likelihood.

VI. The defendants Barros and Duarte argue that their motions in the Superior Court to suppress evidence of eyewitness identifications of them should have been allowed. Barros and Duarte obtained interlocutory review before a single justice of this court who denied relief.

Around midnight on April 22, 1992, Boston police Officer Brian Mulrean and his partner, on patrol in Dorchester, were

flagged down by a man who inaccurately told them that a man had been shot at the Tasty Chicken restaurant. The officers proceeded directly to the restaurant where Mulrean saw the victim of a beating and stabbing lying in a pool of blood. Witnesses at the scene told Mulrean that a large group of young black males between the ages of fifteen and eighteen years had attacked the victim and had fled on foot down Columbia Road toward Dudley Street. The witnesses said that the assailants were of average height and that one was wearing a black jacket with a white "X" on the back. Officer Mulrean made a broadcast over his police radio relaying these descriptions including the direction in which the suspects were seen fleeing.

Two police officers, Dennis Mullen and James Nolan, were on patrol in the area of the Upham's Corner section of Dorchester that night. They were in plain clothes and riding in an unmarked police cruiser when they heard Officer Mulrean's radio transmission and headed toward Upham's Corner. One and one-half blocks from the Tasty Chicken, Mullen saw three young black men, including the defendants Barros and Duarte, walking rapidly away from the restaurant and glancing occasionally over their shoulders. One of the young men was wearing a black jacket with a large "X" on the back, which matched the radio transmission description. Black jackets with a large "X" on the back were not common in Dorchester at the time of this incident. The officers pulled alongside the group, identified themselves as police, and asked the three to remove their hands from their pockets. Officer Nolan drew his revolver and had it out while Officer Mullen pat frisked the young men. Mullen told the group that there had been an incident at the Tasty Chicken and asked the three to accompany the officers to the restaurant. Without protest the three men got into the back of the police car and were brought to the Tasty Chicken restaurant where Duarte and Barros were identified by five eyewitnesses as two of the men who had attacked Charleston Sarjeant. Based on those facts, the motion judge, who was also the trial judge, concluded that the police "had sufficient articulable suspicion to detain" Duarte and Barros for "fifteen minutes on the outside to present [them] to witnesses who had seen a man murdered minutes earlier. *Commonwealth* v. *Crowley*, 29 Mass. App. Ct. 1, 5 (1990). That the police did a pat frisk, and the fact that [Officer Nolan] had his handgun drawn initially does not transform this minimal detention into an arrest. *Com-*

*monwealth* v. *Fraser*, 410 Mass. 541 (1991)." The judge denied the motions, correctly, we hold.

The defendants contend that the police arrested them, that they did so without probable cause to arrest, and that therefore the fruits of the seizure, that is, the eyewitness identifications of them as participants in the attack on Sarjeant, should have been suppressed. See *Commonwealth* v. *Willis*, 415 Mass. 814, 817 (1993). If, however, as the motion judge concluded, rightly, we think, the police merely conducted a threshold inquiry, "we must consider whether the police had a reasonable suspicion, based on specific, articulable facts and reasonable inferences, that the defendant[s] had committed . . . a crime." *Id.* See *Terry* v. *Ohio*, 392 U.S. 1, 20 (1968). Here, as in *Willis*, the motion judge concluded that Officer Nolan drew his revolver and kept it visible while Officer Mullen pat frisked the young men because the officers reasonably were concerned for their safety. *Willis*, *supra*. We agree.

In deciding whether the initial police stop was reasonable we consider the totality of the circumstances which gave rise to the stop. *Commonwealth* v. *Fraser*, 410 Mass. 541, 545 (1991). Officer Mulrean knew that a serious crime had been committed; he had personally seen Sarjeant lying in a pool of blood at the Tasty Chicken and had spoken to a number of eyewitnesses. Those witnesses provided detailed information about the attack including the number of individuals involved, their approximate ages, heights, their skin color and the specific type of jacket worn by one of them, as well as the direction in which they had fled. Those descriptions, which were promptly radioed to Officers Mullen and Nolan, coupled with the officers' observations only moments later of three young black men walking rapidly away from the crime scene while glancing over their shoulders and only one and one-half blocks away gave the officers a reasonable belief that the men were involved in the crime. See *Commonwealth* v. *Crowley*, 29 Mass. App. Ct. 1, 3-4 (1990) (where two men were reported to have robbed bank and fled on foot, police justified in stopping lone man running away from bank one and one-half blocks away); *Commonwealth* v. *Mercado*, 422 Mass. 367 (1996) (where officer received radio call describing shooting, suspects, direction of flight, officer saw victim, spoke with eyewitnesses, and saw two men matching description and acting suspiciously, stop and frisk justified). See also *United States* v. *Longmire*, 761 F.2d 411, 418-419 (7th Cir.

1985) (where officer who issued radio broadcast had received information from victim, other officers properly conducted stop in reliance on broadcast). Cf. *Commonwealth* v. *Cheek*, 413 Mass. 492, 496 (1992) (police stop unreasonable where description of suspect was limited to simply "a black male with a black 3/4 length goose" jacket, such jackets were common at the time, and defendant, a black male, was one-half mile from scene in predominantly black neighborhood). There remains, however, the question whether the scope of the police inquiry, which included transporting the defendants back to the crime scene, was reasonable in the circumstances.

"An expeditious collateral inquiry which might result in the suspects' arrest or prompt release is not unreasonable when done to meet 'the practical demands of effective criminal investigation and law enforcement.' " *Commonwealth* v. *Salerno*, 356 Mass. 642, 646-647 (1970), quoting *Ker* v. *California*, 374 U.S. 23, 34 (1963). The defendants were transported a very short distance and detained for a total of approximately fifteen minutes prior to their being identified and immediately arrested. We have previously held that a defendant's brief detention occasioned by the necessity to transport a witness to the scene of a threshold inquiry is a reasonable part of such an investigatory stop. *Salerno, supra* at 647. We discern no constitutionally significant difference where the defendants are instead detained briefly and brought to the nearby witnesses. See *People* v. *Hicks*, 68 N.Y.2d 234, 242 (1986) ("The transportation did not unduly prolong the detention. Defendant[s] might, alternatively, have been momentarily detained where [they] had been stopped and the witnesses brought there . . . possibly even a more time-consuming process than that chosen"). In every regard, the actions of the police officers here were justified and did not violate the defendants' rights. The motions to suppress were properly denied.

VII. We briefly address the defendants' remaining arguments concerning issues not preserved by objections made at trial. (a) The judge properly permitted the jury to take notes during jury instructions. See *Commonwealth* v. *St. Germain*, 381 Mass. 256, 265-268 (1980). (b) It was not improper for the judge to instruct the jury that in considering whether the defendants acted with extreme atrocity or cruelty they, the jury, represented the "conscience of the community." See *Commonwealth* v. *Fitzmeyer*, 414 Mass. 540, 547 (1993) (jury represented "the com-

munity's collective conscience" in assessing whether the killing had occurred with extreme atrocity or cruelty). See also *Commonwealth* v. *Lawrence*, 404 Mass. 378, 393 (1989). *Commonwealth* v. *Atkins*, 386 Mass. 593, 600-601 (1982). (c) To find Barros and Duarte guilty of murder in the first degree as joint venturers, the jury did not have to find that they knew that Villaroel had a knife. "The Commonwealth is not required to prove that a defendant who was not armed with a dangerous weapon, for example, a knife, knew that a codefendant was armed with a knife. However, the Commonwealth is required to prove beyond a reasonable doubt that a defendant who was not armed with a [dangerous weapon] acted with malice, and that he himself intended to inflict grievous bodily harm on [the victim], or he intended to kill [the victim], or he intended to commit an act which would create a plain and strong likelihood that death would follow the contemplated act." *Commonwealth* v. *Semedo*, 422 Mass. 716, 722-723 n.4 (1996). The jury were properly instructed in accordance with the law.

*Judgments affirmed.*