COMMONWEALTH *vs.* HERBERT GRAVES, JR.

Suffolk.   May 7, 1973. — July 23, 1973.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, HENNESSEY,
KAPLAN, & WILKINS, JJ.

*Evidence,* Admissions and confessions. *Error,* Whether error harm-
ful. *Constitutional Law,* Confrontation of witnesses. *Practice,
Criminal,* New trial. *Joint Enterprise. Law of the Case.*

A harmless, unchallenged instruction to the jury at a criminal trial
"became the law of the case."  [868]
Where the jury were not precluded from considering certain events
by the judge's instructions at a criminal trial, this court was not
precluded from considering such events on appeal from the denial
of a motion for a new trial based on alleged constitutional error.
[868–869]
Constitutional error as to a defendant convicted with a codefendant of
armed robbery of a store and of murder of a police officer shortly
thereafter, in admitting in evidence a pre-trial statement of the
codefendant who did not testify, allegedly contradictory to the
defendant's claim he had abandoned the enterprise when he
got out of a car on the officer's order, who then walked to its other
side and was immediately shot by the codefendant, was held by
this court to be harmless beyond a reasonable doubt where there
was overwhelming evidence, apart from the codefendant's state-
ment, that the defendant had neither abandoned the enterprise
nor submitted to arrest by the officer.  [869–873] HENNESSEY, J.,
with whom KAPLAN and WILKINS, JJ., joined, concurring, on the
grounds that, in view of the short time interval between the arrest
and the murder, abandonment as a matter of law was not a de-
fence and the codefendant's statement was not relevant to any
issue and its admission in evidence was harmless [873–875].

INDICTMENTS found and returned in the Superior Court
on August 6, 1963.

A motion for a new trial was heard by *Leen,* J.

*Daniel F. Featherstone, Jr.,* for the defendant.

*Stephen R. Delinsky,* Assistant District Attorney, for
the Commonwealth.

TAURO, C.J.   The defendant Graves and a codefendant
Johnson were tried jointly before a jury for the murder

of James B. O'Leary, a Boston police officer.[1]   Graves, who testified in his own defence, was convicted of first degree murder (with a recommendation by the jury for leniency), armed robbery, and assault and battery by means of a dangerous weapon.   He received concurrent sentences of life for murder, fifteen to twenty years for armed robbery, and five to ten years for assault and battery by means of a dangerous weapon.   The convictions of both Johnson and Graves were affirmed in *Commonwealth* v. *Johnson*, 352 Mass. 311, 321.   Graves's subsequent motion for a new trial was denied and he now appeals under G. L. c. 278, §§ 33A–33H, from the denial of that motion.   In support of his motion for a new trial he argues that the admission of Johnson's pre-trial statement, which tended to undermine his own testimony of abandonment of the criminal enterprise, was constitutional error and that such error was not harmless beyond a reasonable doubt.

The Superior Court judge (not the trial judge)[2] who heard arguments on Graves's motion for a new trial made careful and detailed findings.   The judge concluded that the admission of Johnson's statement was constitutional error under *Bruton* v. *United States*, 391 U. S. 123, and *Roberts* v. *Russell*, 392 U. S. 293, but he denied the motion because, under *Chapman* v. *California*, 386 U. S. 18, and *Harrington* v. *California* (majority opinion by Douglas, J.), 395 U. S. 250, the error "was harmless beyond a reasonable doubt, and . . . did not contribute to the verdict obtained. . . ."

The pertinent facts which are set out in detail in *Commonwealth* v. *Johnson, supra,* may be briefly stated. On August 1, 1963, Graves drove Johnson to a liquor store on Boylston Street, Boston.   Johnson robbed the store at gunpoint while Graves waited for him in the car.

---

[1] Johnson, who did not testify in his own defence, was convicted of first degree murder, armed robbery, and assault and battery by means of a dangerous weapon.   The jury did not recommend leniency and Johnson received the death sentence.

[2] The trial judge had resigned from the Superior Court to become a Federal judge.

Johnson was chased out of the store and down the street by an employee and some onlookers. As he ran past Graves he told him to start the car. Police Officer O'Leary joined the chase and pursued Johnson onto Commonwealth Avenue. Graves drove the car through some side streets onto Commonwealth Avenue where Johnson jumped into the seat beside the driver while the car was stationary at a red light. Officer O'Leary approached the driver's side of the car and ordered Graves to get out. Officer O'Leary then walked around to the . other side of the car where he was fatally wounded by two bullets fired by Johnson.

Graves knew that Johnson had a gun and he admitted that he was engaged in the joint enterprise to commit armed robbery of the liquor store. He disclaimed responsibility for the murder of Officer O'Leary, however, maintaining that he abandoned the enterprise when Officer O'Leary ordered him out of the car. The evidence relating to Graves's possible abandonment came from several sources and we must decide whether the constitutional error in admitting Johnson's pre-trial statement was, on this issue, harmless beyond a reasonable doubt.

We examine first the standard for determining whether the constitutional error in the instant case is harmless beyond a reasonable doubt. While there are some constitutional errors which can never be construed as harmless (see *Chapman* v. *California,* 386 U. S. 18, 23 and fn. 8), it is clear that violations of the rule announced in *Bruton* v. *United States,* 391 U. S. 123, may, in some circumstances, be considered harmless beyond a reasonable doubt. *Harrington* v. *California,* 395 U. S. 250. *Schneble* v. *Florida,* 405 U. S. 427. *Milton* v. *Wainwright,* 407 U. S. 371. *Brown* v. *United States,* 411 U. S. 223, 231.

The standard in the *Chapman* case announced that "error . . . which possibly influenced the jury adversely to a litigant cannot . . . be conceived of as harmless." Pp. 23–24. In that case the Supreme Court indicated that unless the prosecution could demonstrate beyond a

reasonable doubt that the improper evidence "did not contribute to petitioners' convictions" (p. 26), the error would not be declared harmless. In the *Harrington* case, however, the Supreme Court appeared to deviate from the *Chapman* standard and implied that even where improper evidence possibly influenced the jury, the error might be held harmless if there was other overwhelming evidence of guilt. Over a vigorous dissent, the majority of the Justices concluded that "apart from . . . [the improperly admitted confessions] the case against Harrington was so overwhelming that . . . this violation of *Bruton* was harmless beyond a reasonable doubt. . . ." P. 254.

In *Schneble* v. *Florida,* 405 U. S. 427, the court attempted to merge the two standards, mentioning both the overwhelming "independent evidence of guilt" (p. 431) and the "possibility that the improperly admitted evidence contributed to the conviction." P. 432. Most recently, however, in *Brown* v. *United States,* 411 U. S. 223, 231, the court, in a unanimous opinion, appears to rest its decision not to disturb the petitioner's conviction solely on the basis of overwhelming independent evidence of the petitioner's guilt. After making our own examination (see the *Harrington* case, *supra,* at 254) of the evidence on the issue of abandonment in the instant case, we conclude that the admission of Johnson's pre-trial statement was harmless beyond a reasonable doubt.

The trial judge instructed the jury that to reach the conclusion that Graves had abandoned the enterprise they must find that there was "some appreciable interval between the alleged act of abandonment and the act from responsibility for which escape is sought. It must be possible for a jury to say that the accused had wholly and effectively detached himself from the criminal enterprise before the act with which he is charged is in the process of consummation, or has become so inevitable that it cannot be reasonably stayed. The process of detachment must be such as to show not only a determination on the part of the accused to go no farther, but also such as to

give his . . . [accomplices] [3] a reasonable opportunity, if they desire, to follow his example and refrain from further action before the act in question is committed." These instructions on the elements of abandonment, to which the defendant did not object, were precise and accurate. *Commonwealth* v. *Green,* 302 Mass. 547, 555. *Commonwealth* v. *Lussier,* 333 Mass. 83, 90–91. *Commonwealth* v. *Dellelo,* 349 Mass. 525, 529–531. *LeBlanc* v. *Commonwealth, ante,* 171, 176–177.[4]

The judge continued by instructing the jury that "if you find that there was an abandonment *in accordance with the principles to which I have called your attention* . . . or if you find that . . . [Graves] had been then and

---

[3] Although the judge actually used the word "co-conspirators" it is clear that in fact he was referring to an accomplice to a substantive act which had gone beyond mere conspiracy. The jury were carefully instructed that "Graves is charged as a principal, a principal, not as an accessory after the fact, not as an accessory before the fact, but charged as a principal. . . . Graves is charged as a principal and he is charged with sharing the responsibility with Johnson for everything that Johnson did in so far as each one of these crimes is concerned. He is charged as a principal, the Commonwealth contending that he engaged in this common purpose, undertaking, enterprise, with Johnson and the further additional fact that he was in a position so that he could be found actively taking part in the acts and conduct of Johnson." The judge then explained the legal theory behind holding participants in common enterprises individually responsible for the natural and probable consequences of the acts undertaken in carrying out the plan.

[4] The judge had previously instructed the jury that "[i]t is not necessary that the Commonwealth prove beyond a reasonable doubt or prove at all that murder was part of the original plan between these two persons if you find that they had agreed upon the holdup of this liquor store, Johnson being armed known by Graves that he, Johnson, was armed. It is sufficient to show that the murder was one of the natural or probable consequences of the crime if the jury are satisfied beyond a reasonable doubt that the defendants were engaged in the crime of robbery and that the perpetrator of the robbery was armed. I say, if you are satisfied of these facts beyond a reasonable doubt, that they had this common purpose, this agreement, then, if murder was one of the natural or probable or likely consequences of their plan, then the responsibility for the murder will be visited upon all of them, some legal responsibility. . . .

"A[n] . . . [accomplice] cannot escape responsibility for an act which is the natural result of a criminal scheme which he has helped to devise and carry forward because, as the result of either fear or even a better motive, he concludes to run away at the very instant when the act in question is about to be committed. While it may make no difference whether mere fear or actual repentance is the moving cause, one or the other must lead to an actual and effective retirement before the act in question has become so imminent that its avoidance is practically out of the question."

there arrested by Officer O'Leary and was no longer in a position to render any aid or assistance to his . . . [accomplice] [5] Johnson, *and was no longer free* in so far as the furtherance of their common purpose or design was concerned by virtue of that arrest, then he may not be found guilty of the shooting or the consequences of the shooting, of murder" (emphasis supplied).

The jury might well have concluded from these instructions that there were two possible findings that would prevent Graves from being found guilty of the shooting: (a) if he took steps to dissociate himself from the enterprise in the manner described in the instructions on abandonment, or (b) if he submitted to arrest so that he could no longer render assistance to the common enterprise. The correctness of this bifurcated instruction is not challenged. The correctness of the first part as to abandonment is beyond doubt. We need not pass upon the correctness of the instruction pertaining to possible arrest. [6] Since the instruction did not harm the defendant and was not challenged it "became the law of the case by which the jury properly could be governed." *Commonwealth* v. *Peach,* 239 Mass. 575, 581. See *Cohen* v. *Edinberg,* 225 Mass. 177, 181. See also *Commonwealth* v. *Kneeland,* 20 Pick. 206, 223; *Commonwealth* v. *Maguire,* 313 Mass. 669, 671–674.

Graves maintains that the "jury was not instructed . . . that it could consider . . . events . . . subsequent to the shooting," and that, therefore, we should not take these subsequent events into account in deciding whether the admission of Johnson's pre-trial statement was harmless beyond a reasonable doubt. The short answer to this contention is that there is language in the judge's in-

---

[5] See fn. 3, *supra.*

[6] Reading the instructions as a whole it is clear that the judge did not intimate that Graves could escape liability for the shooting if the jury believed that he considered himself under arrest. Under the instructions as given Graves was to be held responsible for the natural and probable consequences of the enterprise unless the jury believed that Graves's "arrest" had rendered him incapable of furthering the venture or that he had otherwise abandoned the undertaking. We do not rule upon the correctness of these instructions.

structions indicating that such subsequent events should be taken into account.

The judge's instructions in no way indicated that the jury could not consider events subsequent to the shooting.[7] On the contrary, it is difficult to rationalize how a juror could determine whether the alleged "arrest" had effectively prevented Graves's furtherance of the enterprise without considering the subsequent events. Similarly, to find "some appreciable interval between the alleged act of abandonment and the act from responsibility for which escape is sought," a juror would necessarily have to look beyond the claimed act of abandonment.

We conclude, therefore, that since the jury were not precluded from considering Graves's activity after he got out of the car, we are not precluded from looking at events subsequent to the shooting in determining whether the constitutional error was harmless beyond a reasonable doubt. We might add that even with the elimination of the subsequent events we believe that our conclusion that the error was harmless beyond a reasonable doubt would remain unchanged.

After careful review of the entire record including the transcript of the evidence, we conclude that Graves's motion for a new trial was properly denied. At the trial Graves testified that after Officer O'Leary had ordered him to leave the car he got out of the vehicle and stood beside it because he considered himself under arrest. His testimony was that he "panicked" and "ran"[8] only after

[7] It is clear that the jury did consider events subsequent to the shooting in determining whether the defendant had engaged in a joint enterprise because the judge had instructed the jury: "You may also take into consideration what each defendant did after the shooting in so far as it tends to shed light upon what was their agreement, if any, before anything happened." Naturally the jury would not disregard these events in determining whether Graves had abandoned the enterprise.

[8] The defendant testified: "When he came up to the car, Officer O'Leary, he said, 'Stop that car and get out.' So the car was already stopped, so I got out of the car and I stood there. And Officer O'Leary started to go around to the passenger side from the front of the car; and as he got around to the passenger side, well, I heard these two shots; and I seen him fall to the ground; and I panicked

he heard the two shots and saw the police officer fall to the ground. Shortly after his arrest, however, the defendant had made a statement to the police which indicated that he ran away from the car immediately after getting out and that he heard the shots *after* he had taken flight. In this statement, which was read to the jury, the defendant admitted that Officer O'Leary "told me to get out . . . so I got out and ran, by the time I got to the alley I heard the two shots, I thought the officer had shot him."

After his arrest, Johnson, who did not take the stand, also made a statement to the police which indicated that Graves fled from the car *after* the shots were fired without submitting to arrest. In the statement, which was read to the jury, Johnson declared that he shot Officer O'Leary twice and that afterwards "Herbie [Graves] jumped out of the car and run; and I got the hell out of there."

The other evidence bearing on Graves's abandonment defence came from the testimony of four eyewitnesses. A witness, one Megna, testified that "O'Leary ordered the driver out of the car"; that Graves did get out; and that "O'Leary then had seized the driver" but "as . . . [Graves] got out of the car, O'Leary left him and went to the front of the car." On cross-examination, the witness again stated that Graves got out of the car in response to Officer O'Leary's direction "[a]nd . . . stood there" but the witness added "[i]t was no sooner that O'Leary approached the driver, he didn't seize him, but he ran after Johnson at the same time as the driver came out, as I was saying that Johnson ran around to the driver's side of the car, passenger side, that is, O'Leary just went around in front of the car also. I didn't see any more.

and ran." Defence counsel: "Were you yelling something when you were running?" The defendant: "Yes sir." Defence counsel: "What were you yelling?" The defendant: "I said, 'The man's going crazy.'" Defence counsel: "Now, Mr. Graves, when Officer O'Leary said to you, 'Stop the car and get out,' you got out of the car, is that correct?" The defendant: "Yes sir." Defence counsel: "Why did you get out of the car?" The defendant: "Because he is a police officer and I considered myself under arrest."

All I heard was the two shots and the driver run off."

Another witness, one Shepard, testified that after the shooting took place he saw the driver's door open and Graves "looped out of the car . . and keep running." A third witness, one Curran, stated that he heard two shots and then saw a man running toward him who was shouting, "He's wild . . . he's wild."

The fourth witness to this sequence of events, one Taylor, testified that she chased Johnson onto Commonwealth Avenue where he tried to get into a car. She stated that she heard "one or two" shots, then saw Officer O'Leary lying on the street and afterwards saw another man run away from the driver's side of the car who "stood for a minute in the middle of the mall [center of Commonwealth Avenue] with his hands in his pocket[s] and I heard him say something like, 'He's crazy.' " [9]

Apart from Johnson's pre-trial statement, there was, therefore, overwhelming evidence that Graves had neither abandoned the enterprise nor submitted to arrest. Graves's own pre-trial statement contradicted any suggestion of abandonment or submission to arrest. His testimony at the trial did not show an "appreciable interval" between his response to Officer O'Leary and the fatal shooting, nor did it show that he was no longer free to further the enterprise. Three of the eyewitnesses testified that Graves ran away after the shots had been fired. None of these witnesses' testimony gave any indication that Graves had submitted to arrest or that he had otherwise abandoned the enterprise. On the contrary, the opposite inference, namely, that Graves was

[9] The only other evidence bearing on Graves's whereabouts at the time of the shooting came from a chemist employed by the Boston police department who testified that he administered chemical tests on Graves's hands and found an oxidizing residue showing blast and print patterns on both hands. The chemist explained that a blast pattern is obtained from the discharge of a gun and a print pattern is obtained from handling a firearm. The witness stated that he had not formed an opinion whether Graves had fired a gun within twenty-four hours of the test but that the patterns were consistent with his having handled a gun or some other smooth surface coated with an oxidizing residue. As bearing on the defendant's location at the time of the shooting, this evidence could indicate that Graves was close to Johnson when Officer O'Leary was shot.

still part of the enterprise when he tried to escape, would be the most obvious conclusion to draw from such evidence. The witness Megna testified that Graves stood beside the car after he was ordered to do so by Officer O'Leary, but on cross-examination even this witness stated that Officer O'Leary had not seized the defendant but rather that Graves took flight almost immediately after he left the car. Megna's testimony, therefore, presents no evidence on any of the necessary elements of abandonment as they were outlined to the jury, nor does it show that Graves was rendered incapable of furthering the enterprise.[10] In short, the evidence pertaining to the issue of arrest or abandonment was completely opposed to any such suggestion.

The introduction of Johnson's pre-trial statement was an addition to other overwhelming evidence that Graves had neither submitted to arrest nor abandoned the enterprise which resulted in the fatal shooting, and the statement cannot be considered to have influenced the jury. The equivocal and miniscule testimony on this issue by Graves in the face of substantial evidence to the contrary, although conceivably sufficient to raise a jury issue, was hardly sufficient to have raised a reasonable doubt even if the codefendant's statement had been excluded. We conclude "beyond a reasonable doubt that 'the minds of an average jury' would not have found the Commonwealth's case significantly less persuasive had . . . [Johnson's pre-trial statement] been excluded. *Schneble* v. *Florida,* 405 U. S. 427, 432." *Le Blanc* v. *Commonwealth, ante,* 171, at 177. Nor do we think that Johnson's statement contributed to the verdict obtained. *Chapman* v. *California,* 386 U. S. 18, 26. The error in admitting Johnson's statement was, therefore, harmless beyond a reasonable doubt. " '[A] defendant is entitled to a fair trial but not a perfect one,' for there are no

---

[10] On the record of the instant case it is at best doubtful if the evidence on the issue of the alleged abandonment or arrest was sufficient to be presented for jury consideration.

perfect trials." *Brown* v. *United States*, 411 U. S. 223, at 231–232. Graves received a fair trial.

*Order denying motion for new trial affirmed.*

HENNESSEY, J. (concurring, with whom Kaplan and Wilkins, JJ., join. I concur in the denial of the motion for new trial, but on grounds that differ from those relied upon by the court. The court assumes, without deciding, that the defence of abandonment was available to the defendant as to the crime of murder. It then weighs the evidence and concludes that there is overwhelming evidence, independent of Johnson's statement, that there was no abandonment by Graves. Therefore, it reasons, the admission of Johnson's statement, although violative of *Bruton* v. *United States*, 391 U. S. 123, was harmless beyond a reasonable doubt.

Although there was substantial evidence that Graves had not submitted to arrest, I doubt that the weight of the independent evidence to that effect was overwhelming. Megna's testimony is confused and is consistent with either version of the story. Taylor's testimony is in some measure consistent with Graves's version. She saw a man run, *after* O'Leary was shot, and then saw him stand in the center of Commonwealth Avenue for a minute. Against this we have the testimony of Shepard and Curran which supports the version that Graves did not submit to arrest. A portion of Johnson's statement, which Graves contends was admitted in violation of the rule of the *Bruton* case, *supra*, supports this version. Hence I hesitate to conclude that there was an overwhelming weight of evidence, independent of Johnson's statement, to contradict Graves's version of the facts.

In certain United States Supreme Court cases where violations of constitutional principles were held to be harmless beyond a reasonable doubt, it appears that the evidence aligned against the litigant's position was more

convincing and weighty than the evidence relied upon here. See *Harrington* v. *California,* 395 U. S. 250; *Schneble* v. *Florida,* 405 U. S. 427; *Milton* v. *Wainwright,* 407 U. S. 371; *Brown* v. *United States,* 411 U. S. 223. It is appropriate that high standards of quality and quantity of evidence should be required in such instances because appellate courts are totally reliant on printed records. Unlike the fact-finder (whether judge or juror), who has heard the witnesses and considers whether matters have been proved beyond a reasonable doubt, the appellate court has at best a very limited privilege of rejecting evidence as incredible.[1] It is also crucial that the requirements for proof beyond a reasonable doubt should not be diluted at the appellate level, lest they eventually be diluted at the trial level.

Therefore, although I conclude that the admission of Johnson's statement is harmless error, I prefer to follow different reasoning from that relied upon by the majority. I would decide the issue left undecided by the court, and hold that surrender as a result of arrest does not constitute the defence of abandonment, at least where the time interval between the arrest and subsequent crime is measured in seconds as in the case before us. See *Commonwealth* v. *Green,* 302 Mass. 547, 555; *LeBlanc* v. *Commonwealth, ante,* 171, 176–177; LaFave & Scott, Criminal Law 519. "To end an attempted robbery, where the robbers remain in freedom and possessed of a deadly weapon at the place of the attempted robbery until a fatal shooting takes place, there must be at least an appreciable interval between the alleged termination and the fatal shooting, a detachment from the enterprise before the shooting has become so probable that it cannot reasonably be stayed, and such notice or definite act of detachment that other principals in the attempted crime

---

[1] For example, the judge who rules on motions to suppress evidence frequently reaches conclusions "beyond a reasonable doubt" or (synonymously) "by clear and convincing evidence." In such instances, he has seen and heard the witnesses. See cases collected in *Commonwealth* v. *Murphy,* 362 Mass. 524, 549–550.

have opportunity also to abandon it." *Commonwealth* v. *Green, supra,* at 555.

Taking the evidence in the light most favorable to the defendant, including his own in-court testimony, he submitted to arrest only seconds before the fatal shooting occurred. The evidence falls far short of warranting findings that the requisites of the *Green* case, *supra,* have been met, viz.: that there was "an appreciable interval of time between the alleged termination and the fatal shooting" and that there was "such notice or definite act of detachment that other principals in the attempted crime have opportunity also to abandon it." Therefore, the judge was not required to submit the abandonment issue to the jury. Since the admission of Johnson's statement could have only harmed the defendant on the issue of abandonment, and abandonment as a matter of law was not a defence in the case, the admission of the statement was harmless since it was not relevant to any issue in the case. The fact that the judge, perhaps in the interest of caution, chose to submit the issue of abandonment to the jury is no reason for us to give favorable consideration to an argument under the *Bruton* rule which is necessarily based upon a non-issue. The interests of sound jurisprudence would be well served, also, by a clear statement that as matter of law a participant in an armed robbery does not create, by such scant and transitory evidence as appears here, a defence of abandonment for himself as to a murder charged against him under the felony murder rule.

Concededly, the difference between the reasoning relied on by the majority and the reasoning preferred in this concurring opinion is a subtle one. Nevertheless it is an important difference, because this concurrence, in a traditional appellate role, rules that evidence on an issue was insufficient for the jury's consideration, while the majority opinion is based on an infrequently invoked appellate function of weighing and contrasting conflicting evidence as would a fact-finding judge or jury.