COMMONWEALTH vs. MICHAEL LODGE.

Suffolk. January 4, 2000. - May 12, 2000.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, & COWIN, JJ.

*Practice, Criminal,* Required finding, Argument by prosecutor, Assistance of counsel, Capital case. *Homicide. Evidence,* Opinion, Expert opinion, State of mind. *Witness,* Expert. *Error, Harmless. Search and Seizure,* Standing to object.

At the trial of an indictment for murder in the first degree, the evidence was adequate to allow the jury to find beyond a reasonable doubt that the defendant was the murderer [465-466], and to find beyond a reasonable doubt that the defendant acted with deliberate premeditation [466].

At a murder trial, the judge improperly admitted testimony of a witness of his opinion, essentially, that the defendant was guilty; the error, however, was not prejudicial where there was overwhelming credible evidence of the defendant's guilt. [467-468]

At a criminal trial, error in the judge's permitting expert "blood spatter" testimony by a witness who was not properly qualified was harmless, where it was merely cumulative of other properly admitted evidence on the issue. [468-469]

Error, at a criminal trial, in the judge's admission of hearsay testimony of the victim's state of mind, without evidence that the defendant was aware of that state of mind and likely to respond to it, was not prejudicial in light of the strong evidence against the defendant. [469-470]

At a murder trial, the prosecutor's argument that the victim had a "right to live" was not reversible error in light of the strong evidence against the defendant and the judge's forceful curative instructions. [470-471]

At a murder trial, the prosecutor's argument commenting on the defendant's silence was not reversible error in light of the judge's specific curative instructions on the Commonwealth's burden of proof. [471-472]

At a murder trial, a rhetorical comment of the prosecutor in closing argument was not, in context, an improper comment on the defendant's election not to testify. [472]

At a murder trial, any error in the prosecutor's implying personal knowledge about the evidence and in misstating the evidence was cured by the judge's specific curative instructions. [472-473]

Errors in the prosecutor's closing argument, when viewed in the entire context of his argument along with the judge's curative instructions, did not warrant the grant of a new trial. [473]

Police executing a valid search warrant in an apartment properly searched a wall space behind a refrigerator to recover a firearm, and that space was within the curtilage of the apartment: no substantial likelihood of a miscar-

riage of justice arose from the denial of the defendant's motion to suppress the evidence. [473-475]

A defendant convicted of murder in the first degree did not demonstrate ineffective assistance of his trial counsel for not seeking to suppress the defendant's statement to police, which was merely cumulative of other evidence of similar statements to other witnesses, or for not seeking funds to conduct tests on bloodstains that were demonstrated to be consistent with the victim's blood. [475-476]

INDICTMENTS found and returned in the Superior Court Department on March 2, 1995.

The cases were tried before *Patrick J. King*, J.

*Robert S. Sinsheimer* for the defendant.

*Rosemary Daly*, Assistant District Attorney, for the Commonwealth.

COWIN, J. A jury convicted the defendant, Michael Lodge, of murder in the first degree on the ground of deliberate premeditation.[1] The defendant claims on appeal that the judge erred in (1) denying his motion for a required finding of not guilty because there was insufficient evidence that the defendant was the person who committed the murder, and that even if there were sufficient evidence the evidence of premeditation was insufficient; (2) admitting in evidence both the personal opinion of the lead investigator that the defendant was guilty and the investigator's opinion regarding "blood splatter" evidence; and (3) admitting in evidence hearsay statements regarding the victim's state of mind. The defendant also alleges (4) that improper remarks were made by the prosecutor during closing argument and (5) that his trial counsel was ineffective. Finally, defendant argues (6) that his motion to suppress the gun seized from his apartment should have been allowed. We affirm the convictions and decline to exercise our authority under G. L. c. 278, § 33E, to order a new trial or reduce the murder conviction to a lesser degree of guilt.

The jury could have found the following facts. The body of the victim was discovered at approximately 9 P.M. on January 25, 1995, in the apartment she shared with the defendant and his sixteen year old son, Michael, in the Dorchester section of

---

[1] The defendant was also convicted of unlawful possession of a firearm. This conviction is addressed in the defendant's pro se brief, see Parts 5 and 7, *infra.*

Boston. She had suffered a gunshot wound on the left side of her chest. The autopsy revealed that she had died within seconds and that the gun was fired at close range.

The victim and the defendant had lived at the apartment for approximately three years and had been together for thirteen or fourteen years. In the year prior to the murder, the relationship between the victim and the defendant had become troubled. The victim's brother testified that he had observed "discord" in the relationship. Approximately four to six weeks before the murder the victim inquired of Officer Vincent Stevens of the Boston police department, a long-time family friend, regarding the process for obtaining a protective order against the defendant. Approximately two weeks before the murder, the victim telephoned her brother because she was having an argument with the defendant. Her brother came to the apartment and found the victim crying. On January 13, 1995, the defendant asked the victim's brother how to obtain a gun permit and later that day told the victim's brother, "I've been having to watch my back lately." He then motioned toward his side as if to indicate that he had a gun.

On the night of the murder, Renee Covan, a resident of the neighborhood, saw the defendant crouched in a chair on her porch. Despite the fact that it was January, the defendant was wearing a pair of jeans, but no shirt or shoes. He asked Covan to find out where his son was and to telephone his sister. He then asked for a shirt and a pair of sneakers and left her property after receiving them. The defendant and his son knocked on the door of Raymond Pinder's house sometime that evening.[2] He testified that the defendant was not wearing any shirt or shoes. The defendant told Pinder that he had been robbed and needed to use the telephone. The defendant and his son entered Pinder's house, made a telephone call and, within one-half hour, the defendant's brother-in-law and sister arrived to pick up the defendant and his son.

The defendant told his brother-in-law that earlier in the evening somebody rang his doorbell, he opened the door, "they" entered his apartment, and a struggle ensued. The defendant also said that during the struggle a gun went off and that he ran from the apartment, jumped over a fence, and cut

[2]Neither Covan nor Pinder was able to state with certainty the exact time they encountered the defendant.

his knee. The defendant's brother-in-law and sister gave him a shirt and brought him to the police station.

After reporting his version of events to the police, the defendant, his sister, his brother-in-law, and two police officers returned to the defendant's apartment. When the group arrived at the apartment, the defendant approached the locked outer door with a set of keys, but was unable to open the door using the keys. Ultimately, he kicked in the door. The officers followed the defendant as he went downstairs to his apartment. The defendant entered and went toward the kitchen and then directly to the victim's body which was slumped against a wall and covered with clothing.

Soon after the discovery of the victim, the defendant began having trouble breathing and was taken to a hospital by ambulance. At the hospital, Officer David Perez questioned the defendant. The defendant repeated the same version of events he had told his brother-in-law except that he claimed that he was in bed when four black men came to the door and that the victim answered the door. He also stated that during the flight from the apartment he lost consciousness for a period of time.

Shortly after the recovery of the body, the police searched the apartment pursuant to a search warrant. The furniture in the apartment was not disturbed, and although the apartment was cluttered, there was no sign of a struggle. Among the items recovered from the crime scene by the police were a bullet shell casing, a two-by-four piece of lumber that could have come from a bracket on the inside of the apartment's front door, a broken key found lying on the ground outside the door, wire from the apartment's security alarm, a Samurai sword and sheath, and bloodstains from the stairs and the wall and from under the victim's fingernails. The two-by-four piece of lumber was stained with blood type O, the victim's blood type. The other bloodstains were identified as human blood but there was not enough for grouping tests.

During the search of the apartment, Detective Paul Barnicle recovered a .38 caliber semiautomatic pistol, which was missing a single bullet, from the kitchen wall space behind the refrigerator. The area was loosely covered with insulation and under the insulation was a circuit breaker box framed into the wall. There was a slight gap between the circuit breaker box and the wall creating a hole. Detective Barnicle peered into the hole and saw a hanger attached to the top of the circuit breaker box door.

When he pulled on the hanger the door came up and he saw the gun inside the wall space. The police had to break down the wall to retrieve the gun. A comparison of the bullet recovered from the victim and the gun indicated that the shot that killed the victim was fired from the gun recovered from the apartment.

At 1:10 A.M. on January 27, 1995, after his release from the hospital, the defendant voluntarily provided a formal statement to the Boston police department that was consistent with the statement he provided to Officer Perez at the hospital. In his statement, the defendant added that he had had a good relationship with the victim, that the victim may have known the intruders, and that he recently received a $100,000 settlement from the city of Boston.

1. *Motions for a required finding.* The defendant contests the judge's denial of his motions for a required finding of not guilty filed at the close of the Commonwealth's case and again at the close of all the evidence. He claims that there was insufficient evidence to establish that he was the murderer and that the murder was committed with deliberate premeditation. We disagree.

In reviewing a denial of a motion for a required finding, we determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979). " 'The question of guilt must not be left to conjecture or surmise.' *Commonwealth* v. *Anderson*, 396 Mass. 306, 312 (1985). However, circumstantial evidence is competent to establish guilt beyond a reasonable doubt. *Commonwealth* v. *Nadworny*, 396 Mass. 342, 354 (1985), cert. denied, 477 U.S. 904 (1986), and cases cited. An inference drawn from circumstantial evidence 'need only be reasonable and possible; it need not be necessary or inescapable.' *Commonwealth* v. *Beckett*, 373 Mass. 329, 341 (1977)." *Commonwealth* v. *Bush*, 427 Mass. 26, 30 (1998). Applying these standards, we conclude that there was sufficient evidence to permit the jury to determine that the defendant was the murderer and that he acted with deliberate premeditation.

The evidence indicated that the relationship between the defendant and the victim had deteriorated and that the defendant had shown interest in, and perhaps had acquired, a gun shortly

before the murder. The defendant's version of the events the night of the murder was that he and his girl friend had been attacked in their apartment by armed intruders. Yet, his actions that night were inconsistent with his account. He ran to neighbors' homes, but he did not ask them to telephone the police. By his own admission, the defendant was with the victim at the time she was murdered. When the police returned to the apartment with the defendant, they found the door to the apartment locked; the defendant apparently was aware of the location of the body despite the fact that it was not visible when entering the apartment. The victim's body had been draped with clothing, and the murder weapon was found well hidden in a small opening in the wall behind the refrigerator in the defendant's apartment. From this evidence, the jury could have inferred that it was the defendant, not an intruder, who had taken the time to cover the victim's body, hide the murder weapon, and lock the door. It is doubtful indeed that intruders would have even known of the hiding place behind the refrigerator. The defendant also had a motive for the shooting and the means with which to commit it. The Commonwealth need not show that no other person could have committed the crime. See *Cramer* v. *Commonwealth*, 419 Mass. 106, 112 (1994); *Commonwealth* v. *Latimore*, *supra* at 678-679. These facts were adequate to allow the jury to find, beyond a reasonable doubt, that the defendant was the murderer.

As to evidence of premeditation, the defendant had ensured that his sixteen year old son, who had been home from school ill on the day of the murder, was not home at the time of the shooting. There were no signs of a struggle in the apartment. Indeed, the apartment was quite small and cluttered; yet nothing within was amiss. Further, the gun had been fired from a position against the victim's clothing. The jury could reasonably have concluded that this evidence showed beyond a reasonable doubt that the defendant committed the murder with deliberate premeditation. See *Commonwealth* v. *Williams*, 422 Mass. 111, 123 (1996) (use of firearm in killing enough to support deliberately premeditated murder); *Commonwealth* v. *Robertson*, 408 Mass. 747, 756-757 (1990) (use of firearm supports finding of malice; evidence sufficient to support deliberate premeditation even if killing followed reflection by only few seconds). See also *Commonwealth* v. *Stirling*, 351 Mass. 68, 75 (1966) (lack of sign of struggle may be considered in regard to deliberately premeditated malice aforethought).

2. *Opinion testimony.* Detective Paul Barnicle, the lead investigator, was cross-examined at length about alleged defects in the investigation of the murder and the failure of the police to conduct certain tests and pursue other suspects. The defense theme was that the police had "rush[ed] to judgment" against this defendant. On redirect examination, the prosecutor asked Detective Barnicle why he had not done "any of those things that [defense counsel] asked?" The detective answered: "Because by the physical evidence and the defendant's own words, everything pointed to him . . . as being the person responsible for the murder of [the victim]." The officer then proceeded to summarize all the incriminating evidence the police had amassed against the defendant.[3]

A witness may not give an opinion regarding the culpability of the defendant. See *Commonwealth* v. *Hesketh,* 386 Mass. 153, 161-162 (1982). That is essentially what Detective Barnicle was permitted to do in this case. He testified that all the evidence pointed to the defendant as the murderer, i.e., it was his opinion that the defendant was guilty. Such testimony is improper. However, when the defendant himself puts in issue the negligence or judgment of the police officer or the police investigation suggesting to the jury that it is that poor judgment or negligence that inured to the defendant's prejudice and permitted the true culprit to escape, see *Commonwealth* v. *Bowden,* 379 Mass. 472, 485-486 (1980), the government cannot be precluded entirely from explaining why the action taken was correct in the circumstances. The defendant has inserted into the case the relevance of the police judgment and decisions; the officer must be allowed to defend that judgment.[4] But a general expression of the officer's opinion of guilt, followed by a recital of all the evidence against the defendant, is not permitted. Rather, the prosecutor may proceed by inquiring of the officer the reason for each specific omission or decision. As suggested in *Commonwealth* v. *Flanagan,* 20 Mass. App. Ct. 472, 476 n.2 (1985), this area concerns subjective reasons for the failure to conduct certain tests and it "should be approached

[3]Defense counsel repeatedly objected to this testimony and moved to strike as well. His objections were overruled and his motions denied.

[4]Half the defendant's entire cross-examination of Barnicle was devoted to the detective's allegedly unjustified pursuit of this defendant and the claimed ineptitude of the police investigation. Questions on this subject comprised approximately twenty-four pages of cross-examination.

with caution." Before any inquiry, the prosecutor should request a sidebar conference to alert the judge to the proposed line of questioning and, if necessary, the specific questions to be asked and their expected responses. The exchange concerning the detective's opinion should not have been permitted.

We must now determine whether this error was prejudicial. See *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983) ("[a]n error is nonprejudicial only '[i]f . . . the conviction is sure that the error did not influence the jury, or had but very slight effect . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected' ").

We recognize that the improper opinion testimony was that of the lead investigator. We are convinced, however, that, stripping the improper testimony from the other evidence, "the judgment was not substantially swayed by the error." *Id.* The defendant's defense was that four unknown intruders killed the victim. There was overwhelming credible evidence to the contrary. The defendant testified that he (and only he) was with the victim when the intruders entered their home. There was no evidence of a struggle. A gun was found at the scene hidden in a location that an intruder could not have known existed. That gun killed the victim. All this evidence contradicted the defendant's claim that intruders killed the victim, and the jury surely had to choose from two conflicting stories.[5] We are convinced that the defendant was not prejudiced. We are confident that, if the error had not been made, the jury verdict would have been the same. *Commonwealth* v. *Ruddock*, 428 Mass. 288, 292 n.3 (1998).[6]

The defendant claims in addition that Detective Barnicle was improperly permitted to give expert opinion testimony regard-

[5]There was also other strong evidence that the defendant knew that the victim was dead before her body was discovered. For example, there was testimony that the defendant knew the location of the body. The body had been covered, suggesting that intruders did not shoot the victim in haste.

[6]Contrary to the defendant's contention, the judge did not err in failing to give a *Bowden* instruction. See *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980). The judge did not remove the issue from the jury's consideration. He specifically permitted the defendant to argue to the jury all the alleged failures of the police and the defendant availed himself of the opportunity.

ing the direction in which blood falls. Detective Barnicle testified over objection that when blood drops it does not go straight down, but forms a teardrop, the tail of which indicates the direction in which it is falling, with the smaller part or tail farther from the person bleeding. Such testimony may well be within the general knowledge of a police homicide investigator who has investigated about 200 homicides in six years and does not rise to the level of expert "blood splatter" testimony. Cf. *State* v. *Moore*, 458 N.W.2d 90, 98 (Minn. 1990) (blood splatter analysis determines position of victim's body by placement and formation of blood splatters at time wound inflicted). Had Detective Barnicle been qualified based on his experience, it would have been within the judge's discretion to admit this evidence. See *State* v. *Greely*, 115 N.H. 461, 468 (1975) (testimony of State police officer, member of narcotic bureau for three years, describing type and quantity of controlled drugs seized in raid); *State* v. *Jameson*, 194 W. Va. 561, 567-568 (1995) (fire fighters whose work focused on investigation of fires, not qualified as expert witnesses, were in position to have "peculiar knowledge" about "pour patterns" of fires that appeared to be manmade). See also *Cammon* v. *State*, 269 Ga. 470, 471-474 (1998) (officer not qualified as ballistics expert properly permitted to opine as to trajectory of bullet that killed victim based on extensive investigation of homicide). Here, however, the detective was not asked appropriate foundation questions and it was error to permit him to give the contested testimony. In any event, the error was harmless. Cf. *Commonwealth* v. *Salcedo*, 405 Mass. 346, 350 (1989). Detective Barnicle's testimony was cumulative of testimony of the director of the Boston police crime laboratory who had previously testified regarding the direction of the blood flow in this case.[7]

3. *Relationship between the defendant and the victim.* The defendant maintains that the judge erred by permitting a friend of the family to testify to a conversation he had with the victim approximately four to six weeks prior to the murder. The defendant objected to this testimony at trial. The victim told the

[7]The defendant also objected to the detective's testimony that blood can be transferred to the wall from bloody hands or clothing. As the defense counsel stated during a sidebar conference, the subject of the transfer of blood from one's hands to objects touched is not a subject requiring expert testimony. In any event, the director of the Boston police crime laboratory had also testified previously to the fact that blood is transferred from one's body to objects touched.

friend that she had been out all night, and that her live-in boy friend had taken her keys and locked her out of the apartment. She then asked how she could obtain a protective order against her boy friend. The defendant contends that these statements were not admissible to show a hostile relationship between the defendant and the victim.

Statements of past violence or misconduct for the purpose of showing the "hostile relationship between the defendant and the victim" are generally not admissible. *Commonwealth* v. *Seabrooks*, 425 Mass. 507, 511 (1997).[8] An exception to this rule permits admission of evidence of a victim's state of mind as proof of the defendant's motive *provided that* there is also evidence, direct or inferential, that the defendant was aware of that state of mind at the time of the crime and would be likely to respond to it. See *Commonwealth* v. *Lowe*, 391 Mass. 97, 104-106, cert. denied, 469 U.S. 840 (1984); *Commonwealth* v. *Borodine*, 371 Mass. 1, 7-9 (1976), cert. denied, 429 U.S. 1049 (1977).

The statements here do not fall within that exception and should not have been admitted. The statements are indicative of the victim's state of mind that the relationship had deteriorated but there was no other evidence that the defendant was aware of that state of mind. Thus, the fundamental prerequisite for admissibility of testimony of the victim's state of mind was lacking and this hearsay testimony should not have been admitted. The error was insubstantial in light of the strong evidence of the defendant's guilt; it did not prejudice the defendant and does not constitute a basis for a new trial. See *Commonwealth* v. *Arce*, 426 Mass. 601, 603 (1998); *Commonwealth* v. *Andrade*, 422 Mass. 236, 241-242 (1996), citing *Commonwealth* v. *Zagranski*, 408 Mass. 278, 284 (1990).

4. *Closing argument.* The defendant challenges several statements in the prosecutor's closing argument. The prosecutor told the jury that the victim "was entitled to a right, too. She was entitled to the right to live and this man took it." A "right to live" argument was determined to be inappropriate in *Com-*

[8]As noted in *Commonwealth* v. *Seabrooks*, 425 Mass. 507, 512 n.6 (1997), a witness may testify to observations of the defendant's prior bad acts toward a victim. Such testimony is obviously not hearsay, as it recounts observations, and it is admissible to show the relationship of the parties. See, e.g., *Commonwealth* v. *Andrade*, 422 Mass. 236, 239-240 (1996); *Commonwealth* v. *Gil*, 393 Mass. 204, 215-217 (1984).

*monwealth* v. *Barros*, 425 Mass. 572, 581 (1997). The prosecutor did not have the benefit of that decision at the time of trial. However, we indicated several years earlier that such remarks "come very close to an improper appeal to sympathy." *Commonwealth* v. *Palmariello*, 392 Mass. 126, 135 (1984). Because the defendant made a timely objection to this argument, we consider the consequences of such error. "[O]n the facts of given cases, close questions arise whether the prosecutor has gone over the line between fair and improper argument. In such cases, we must and do recognize that closing argument is identified as argument, the jury understands that, instructions from the judge inform the jury that closing argument is not evidence, and instructions may mitigate any prejudice in the final argument." *Commonwealth* v. *Kozec*, 399 Mass. 514, 517 (1987). The Commonwealth's case was strong. See discussion in Part 1, *supra*. The judge properly and forcefully directed the jury's attention to the "right to live" comment and instructed them that they must not be governed by emotion in deciding the facts of the case, but must perform their duties without bias, prejudice, sympathy or emotion.[9] In these circumstances, we are satisfied that the prosecutor's error, to which timely objection was made, is unlikely to have affected the jury verdict, and therefore is not reversible. See *Commonwealth* v. *Barros*, *supra* at 582.

The defendant contends that two remarks by the prosecutor infringed on his right to silence under art. 12 of the Declaration of Rights of the Massachusetts Constitution and the Fifth Amendment to the United States Constitution. There was evidence that the defendant had been provided with sneakers and a sweatshirt after he ran from his apartment. These items were not admitted in evidence at trial. The prosecutor asked in

---

[9]"[T]here was reference to [the victim's] right to live. Obviously, in any situation when someone dies, it constitutes a tragedy, but in deciding the facts of this case, the jury cannot be governed by emotion. The jury has to carefully and impartially consider all the evidence in the case and determine whether or not the Commonwealth has met its burden of proof; that is, to show beyond a reasonable doubt that the defendant is guilty of the crimes with respect to which he is charged, and the jury cannot be governed by emotion for the deceased.

"Now that the attorneys have finished with all their evidence and their closing arguments, it is my responsibility to explain the law that the jury is to apply to the facts which you find. It is the responsibility of the jury to decide what the facts are in this case and to apply the law as stated by me. You are to perform your duties without bias, prejudice, or sympathy as to any party."

his summation: "Where's the sneakers? . . . Never answered that question, did he, from his attorney? Never answered that. Why? Why did he get rid of those? Some blood on it?" These remarks were improper. They were comments on the defendant's right to silence and as such tended to shift the burden. Nonetheless, we do not believe reversal is required. In response to the defendant's objection, the judge specifically instructed the jury: "[D]uring closing argument, [the prosecutor] made reference to the fact that the defendant, through his attorney . . . did not respond to certain questions about what happened to the sneakers and what happened to the sweatshirt that [the neighbor] testified she gave the defendant. I would remind you again that, as I told you already, the defendant has no burden of proof in this case. Neither the defendant nor [defense counsel] have any obligation to respond to any of the evidence introduced by the Commonwealth and had no obligation to answer any questions. The sole burden of proof in this case is upon the Commonwealth." It is presumed that the jury followed the judge's instructions. *Commonwealth* v. *Barros, supra* at 580, and cases cited.[10]

Later, the prosecutor also asked in the same vein: "What does the defendant tell you?" This rhetorical question, although a poor choice of words, was not error in context. The inquiry preceded a summary of the defendant's account to the police and a critique of it. Accordingly, it was not a comment on the defendant's election not to testify. See *Commonwealth* v. *Sherick*, 401 Mass. 302, 304 (1987) (no error in prosecutor's comments on defendant's statement to police).

The defendant argues that the prosecutor implied personal knowledge about the evidence. The prosecutor said: "We know about the restraining order against him." The judge wisely

---

[10]The quoted portion of the closing argument is also troublesome because it suggests that the defendant could not answer an inquiry from his attorney. In fact, the defendant did not testify. The argument further assumes that there was evidence that the defendant "g[o]t rid" of the sneakers. There was no such evidence. The defendant did not object to the argument on these grounds and does not make such contention on appeal. We have considered these statements pursuant to our obligation under G. L. c. 278, § 33E. The judge instructed the jury twice to rely on their own memories of the evidence rather than the attorneys' memories. He also specifically instructed the jurors at the start of the trial that nothing the assistant district attorney said constituted evidence. Given these instructions and those quoted in the text, there was no substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992).

interceded here and suggested that the prosecutor had misspoken. The prosecutor then apologized and stated that he had been in error and that "there was evidence that she was looking for a restraining order and that she had been locked out of the house." This was still incorrect, as the testimony regarding the restraining order was admitted into evidence only in regard to the victim's state of mind. The judge, however, in his final instructions, reminded the jury that "there was no evidence of any restraining order [and] the only reason . . . the statements of the deceased concerning her questions about a restraining order [had been admitted] was to show her state of mind. It was not admitted for the truth of what she said, merely to show her state of mind in terms of the relationship with the defendant." It is presumed that the jury followed the judge's instructions. *Commonwealth* v. *Barros, supra* at 580, and cases cited. Any error was cured by these instructions.

The defendant urges that the prosecutor's statement, "There's no registry of palm prints," implies special knowledge by the prosecutor. However, the defendant has taken this statement out of context. The entire statement on the subject was as follows: "My brother has given you some little bits of information . . . . [Defense counsel] talks about a registry of palm prints. There's no registry of palm prints. There was never any evidence of that. Maybe fingerprints you could find some, but no palm print registry." This appears to be a statement that there had been no evidence of any such registry. Indeed, the judge who heard the argument interpreted it as such. Nevertheless, the judge took the extra precaution of repeating to the jury that it was their memory of the evidence that controls and that if anything mentioned by the attorneys differed from their memory, they should not rely on the memory of the attorneys. There was no error. Although there were several errors in the prosecutor's closing, when his argument is viewed in its entirety, with the curative jury instructions, these errors do not entitle the defendant to a new trial. Cf. *Commonwealth* v. *Kozec*, 399 Mass. 514, 516-525 (1987).

5. *Motion to suppress.* The defendant argues on appeal that the judge erred in denying his motion to suppress all physical evidence found at the scene (i.e., the gun) because the area searched (the space behind the refrigerator) was not within the scope of the warrant.[11] However, the issue whether the search for the weapon was outside the curtilage of the apartment was

---

[11]The motion was heard just before the start of the trial.

not mentioned either in the defendant's motion to suppress or in his accompanying memorandum of law.[12] Thus, the defendant presents a new theory not before the judge. See Mass. R. Crim. P. 13 (a) (2), 378 Mass. 871 (1979). "This he may not do." *Commonwealth* v. *Sawyer*, 389 Mass. 686, 692 (1983), citing *Commonwealth* v. *Lewis*, 346 Mass. 373, 383 (1963), cert. denied, 376 U.S. 933 (1964). We therefore review the claim only to determine whether there has been a substantial likelihood of a miscarriage of justice. G. L. c. 278, § 33E. See *Commonwealth* v. *Sawyer, supra.*

The warrant issued for a search of the "basement apartment and entryway thereto, contained within a [two] and one half story freestanding duplex house." Items for which the police were authorized to search were evidence of a crime, "including handguns, ammunition thereto, expended bullets and casings." The police located the murder weapon in a space behind the refrigerator. The defendant argues that this area behind the refrigerator was a common space and not within the curtilage of his apartment and that his motion to suppress should have been allowed on that ground.

If the defendant's complaint is that the area searched was a common area, the defendant lacks standing under both the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights to raise the issue in regard to the murder conviction. Possession of a firearm is not an essential element of deliberately premeditated murder. *Commonwealth* v. *Montanez*, 410 Mass. 290, 300-301 (1991) (where possession is essential element of charge, defendant has standing under art. 14 to contest search and seizure of evidence); *Commonwealth* v. *Frazier*, 410 Mass. 235, 241-244 & n.3 (1991) (same); *Commonwealth* v. *Amendola*, 406 Mass. 592, 601 (1990) (same).[13] However, he does not lack standing to

---

[12]The motion to suppress lists six grounds, five of which clearly do not address the issue. One ground is that the actions of the police "unlawfully exceeded the bounds of permissible inquiry." There is no "inquiry" involved in the application for or execution of a search warrant. Arguably, the defendant could be alleging that the police exceeded the scope of the search warrant. However, the memorandum of law submitted with the motion does not address the issue whether the search exceeded the scope of the warrant and the defendant waived oral argument on his motion. Thus, this proposition was never brought to the judge's attention.

[13]Further, the defendant has no constitutionally protected expectation of

raise the issue in regard to his conviction of unlawful posses-
sion of a firearm. The defendant's pro se brief raises this argu-
ment. The motion was properly denied. The area behind the
refrigerator was within the curtilage of the apartment. There
was no evidence that the space in which the gun was found was
open to, or used by, other tenants or visitors to the apartment
building, or that anyone other than the tenants of the apartment
could even access that area. Cf. *Commonwealth* v. *McCarthy*,
428 Mass. 871, 874-875 (1999) (parking space).[14] In fact, the
police only gained access to the space by ripping open the wall
behind the refrigerator.

6. *Ineffective assistance of counsel.* Pursuant to the guidelines
of *Commonwealth* v. *Moffett*, 383 Mass. 201, 216 (1981), the
defendant raises two claims regarding trial counsel's perfor-
mance. He contends that counsel never filed a motion to sup-
press the statement the defendant gave the police. The defendant
argues that, if such a motion had been filed, he may have been
able to establish that his statement was not voluntary because
he was so distraught at the time. There is no merit to this argu-
ment. The defendant made similar statements to other persons,
all of which were consistent. Even if the statement to the police
had been suppressed, other witnesses provided the same
evidence. Further, counsel specifically sought the admission of
this statement. It was part of his over-all strategy that the
defendant had repeatedly presented the same version of the
events surrounding the murder; that the defendant lacked any
motive to harm the victim; and that the two enjoyed a good
relationship. Consistent with this strategy, defense counsel vigor-
ously presented a *Bowden* defense. *Commonwealth* v. *Bowden*,
379 Mass. 472, 485-486 (1980). See note 6, *supra.*

The defendant also claims that counsel did not seek to obtain
funds to conduct tests of blood, specifically the blood on the
two-by-four. Such investigation, he argues, would have identi-
fied the true perpetrator and exonerated the defendant. The
police chemist testified that there were bloodstains at either end
of the piece of wood. The stain that could be tested was
consistent with the victim's blood and not the defendant's. No

---

privacy in a common area. See *Commonwealth* v. *Montanez*, 410 Mass. 290,
302-303 (1991).

[14]Indeed, it appears that the defendant himself, by utilizing this area in the
wall space, had extended the curtilage of the apartment by enlarging the area
he occupied.

evidence has been presented that further testing would have proved fruitful. The defendant has not shown that expert testing would have accomplished "something material for the defense." *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977).

7. *Defendant's pro se brief.* The defendant, in a supplemental pro se brief, raises a number of issues that have been addressed in earlier parts of this opinion. We further note that the evidence was sufficient to convict the defendant of constructive possession of the firearm. His brother-in-law as well as the victim's brother testified that the defendant lived in the apartment in which the gun was found. As to his arguments regarding ineffective assistance of counsel regarding the "secretor" issue and the composition of the jury, nothing in the record supports either claim.

8. *Relief pursuant to G. L. c. 278, § 33E.* We have considered the entire record pursuant to our obligation under G. L. c. 278, § 33E. There is no reason to exercise our authority to reduce the jury's murder verdict or to order a new trial. The defendant is entitled to a fair trial, not a perfect one. *Commonwealth* v. *Graves*, 363 Mass. 863, 872-873 (1973). The defendant received a fair trial, and the jury's murder verdict is consistent with the evidence that the defendant acted with deliberate premeditation and a clear purpose to kill his girl friend.

*Judgments affirmed.*