NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-967

COMMONWEALTH

<u>vs</u>.

CARLOS VIEIRA.

<u>MEMORANDUM AND ORDER PURSUANT TO RULE 23.0</u>

Following a jury trial in the Salem Superior Court, the defendant, Carlos Vieira, appeals from his convictions of two counts of aggravated rape of a child by age difference and one count of indecent assault and battery on a child under the age of fourteen.  We affirm.

<u>Background</u>.  Evidence showed that in June 2018, the defendant, age forty-nine, met the thirteen year old victim through a social media application.  They arranged to meet at night in the defendant's SUV where they engaged in oral sex, and the defendant "humped" the victim's thigh.

Months later, on September 13, 2018, a cluster of residential gas explosions in Lawrence prompted the victim's

family to evacuate.  Leaving the city in the passenger seat of his aunt's car, the victim "noticed that a cop [was] directing traffic" at an intersection.  He immediately recognized the officer as the person involved in the sexual encounter in the SUV.

In January 2019, the victim's mother suspected that her friend's teenage daughter, who recently moved in with them, had taken a watch.  When the victim's mother confronted the daughter about the watch, she became "very defensive" and told the victim's mother that she "should be checking [the victim's] phone."  With the escalation of the argument, the victim's mother confiscated the victim's electronics and contacted her friend.

When the friend arrived, the victim's mother asked her to speak to the victim.  The friend spoke to the victim alone, and she testified that during this conversation, the victim "seemed hesitant to speak with [her]," but he told her that he "did something" and was "not proud of it."  The victim then explained to her that through social media he met a man, and that he "performed oral sex on the man, then the man performed oral sex on him and dry humped him."  The victim then told the friend that this man was "a police officer" and that he saw him directing traffic on the day of the explosions.  After this

2

conversation, the friend told the victim's mother, who then searched the victim's phone and contacted the police.

A State police investigation focused on the defendant. Detectives confirmed that the defendant was a police officer who worked on the day of the gas explosions. The victim selected the defendant's photograph from an array as the perpetrator. After meeting with the detectives and being informed of his Miranda rights, the defendant acknowledged in an audio recorded interview that he had been using the same social media application that had been used to set up the meeting.

Discussion. 1. Designation of first complaint witness. A first complaint witness is generally "the person who was first told of the assault." Commonwealth v. King 445 Mass. 217, 243 (2005). Because the evidence showed that the victim first reported the sexual assaults to the mother's friend, that friend properly testified as the first complaint witness. For the first time, the defendant contends that the judge erred by allowing this testimony because the friend's daughter (who did not testify) should have been designated as the first complaint witness. We discern no error and no "substantial risk of a miscarriage of justice." Commonwealth v. Freeman, 352 Mass. 556, 564 (1967).

The record does not support the defendant's claim that someone else should have been designated as the first complaint

3

witness.  For example, the defendant cites a sidebar discussion about the friend's daughter telling the victim's mother to check his phone because he had been "meeting men."  The prosecutor also mentioned this phone incident in the opening statement.  The defendant contends that knowledge about the victim "meeting men" indicated that the victim necessarily reported the sexual assaults to the friend's daughter.  Even if the friend's daughter would have testified about the victim "meeting men," the phrase, in context, referred to meeting men on the social media application on the victim's phone.  In these circumstances, the phrase "meeting men" on the phone does not equate with a report of a sexual assault that would require a voir dire to sort out "who was the first complaint witness." Commonwealth v. Stuckich, 450 Mass. 449, 455 (2008).  See, e.g., Commonwealth v. Murungu, 450 Mass. 441, 446 (2008) (encounter with unhappy or upset victim who does not report sexual assault "does not constitute a complaint").  The defendant also points to suppression hearing testimony from a State police detective indicating that the victim first reported abuse to his "cousin" (referring to the friend's daughter).  This hearsay testimony would likewise be insufficient to require a voir dire because the victim expressly denied, at trial, that he reported the sexual assaults to anyone before the disclosure to his mother's friend, and defense counsel acknowledged in his opening

4

statement that the victim "didn't tell anybody about it" before this report. See id. at 447 (defense counsel may "show that the first person to whom the complainant made a complaint was in fact someone other than the proffered first complaint witness"). Thus, the record does not indicate a "contradiction" in the evidence that would warrant a voir dire. Stuckich, supra.

2. Inadequate investigation. Evidence showing a "failure of the authorities to conduct certain tests or produce certain evidence" or showing that "certain police procedures [were] not followed" is a permissible ground on which to build a defense and may raise a reasonable doubt as to the defendant's guilt. Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980). Such a defense, however, "is a two-edged sword for the defendant, because it opens the door for the Commonwealth to offer evidence explaining why the police did not follow the line of investigation suggested by the defense," Commonwealth v. Silva-Santiago, 453 Mass. 782, 803 n.25 (2009), and because "the officer[s] must be allowed to defend that judgment." Commonwealth v. Lodge, 431 Mass. 461, 467 (2000).

For the first time, the defendant contends that during cross-examination about investigative steps that were not taken, State police detectives Stephen Buccheri and Sergeant Stephen O'Connor "exceeded the bounds of proper testimony when they opined on the issue of guilt or innocence." We discern no error

and no "substantial risk of a miscarriage of justice." Freeman, 352 Mass. at 564.

Defense counsel cross-examined Sgt. O'Connor about the victim's initial inability to identify the defendant and the absence of any effort by the police to obtain a description of the perpetrator's physical characteristics. When cross-examining Sgt. O'Connor about the victim's initial inability to select the defendant's photograph from an array, defense counsel asked, "[Y]ou weren't really sure if that was the person or not at that particular point in time, right?" Sgt. O'Connor replied that the police were sure that it was the defendant whom the victim "was talking about." When counsel pressed further and asked "why" the police did not ask the victim "anything about [the perpetrator's] weight, facial hair, height, tattoos, or any identifying characteristics," Sgt. O'Connor replied that the victim identified the defendant based upon "the car he drove, where he lived, [and that] he was a police officer." When pressed even further, Sgt. O'Connor testified, "Our focus was on the person that he saw at the intersection, driving that car [that] belongs to [the defendant]. He pointed out the house[,] that this particular person drives the car. There's one person, one male party that lives in that house."

The cross-examination of Detective Buccheri followed a similar path. Counsel established through cross-examination

6

that the police did not obtain a description of the perpetrator, even after the victim failed to make any identification from the first photographic array. Counsel asked, "[W]ouldn't it have made some sense to [get a description of the perpetrator]?" Det. Buccheri responded that he "was presented with a substantial amount of actionable intelligence[,]" including "a plate, a known location, a confirmed ID of [the defendant] that occurred at an intersection of Beacon and Mount Vernon, who was a Lawrence police officer."

Read in context, this testimony of the detectives did not express an opinion on the guilt of the defendant. Instead, responding to counsel's questions, the detectives simply explained why they chose not to obtain a description of the perpetrator based upon other actionable information that they had available. Contrast Lodge, 431 Mass. at 467 (improper for prosecutor to elicit testimony about "a general expression of the officer's opinion of guilt, followed by a recital of all the evidence against the defendant"). Notably, in his closing argument, defense counsel repeatedly referred to this evidence as the police "jump[ing] to a conclusion" and failing to at least obtain a description of the perpetrator -- especially after the victim had failed to initially identify the defendant from a photographic array. The defendant "may not now be heard to cry foul over evidence that [he] purposefully introduced and

7

tried to use to [his] advantage." Commonwealth v. Chaleumphong, 434 Mass. 70, 76 (2001).

Finally, we disagree with the defendant's suggestion that counsel was ineffective because he should have moved to strike the detectives' cross-examination testimony. He points to a sidebar discussion where the judge cautioned counsel that his questions opened the door to witnesses explaining why they took certain investigative steps. Counsel responded, "It was inadvertent." From this exchange, the defendant now concludes that counsel lacked any strategy. "[A]n ineffective assistance of counsel challenge made on the trial record alone is the weakest form of such a challenge because it is bereft of any explanation by trial counsel for his actions and suggestive of strategy contrived by a defendant viewing the case with hindsight." Commonwealth v. Peloquin, 437 Mass. 204, 210 n.5 (2002). Nevertheless, as previously discussed, the record here shows that counsel pursued an evident strategy of highlighting weaknesses in the police investigation. This strategy continued after the sidebar discussion and continued through the closing argument. Lack of success does not equate with a lack of a reasonable strategy. See Commonwealth v. Kolenovic, 471 Mass. 664, 675 (2015) (strategic choices may be reasonable despite unfavorable outcome or availability of different choices).

8

In sum, we discern no error nor combination of errors that resulted in a substantial risk of a miscarriage of justice.

Judgments affirmed.

By the Court (Rubin, Shin & Hodgens, JJ.[1]),

*Paul Little*

Clerk

Entered:  January 27, 2025.

---

[1] The panelists are listed in order of seniority.